**F I L E D**

PUBLISH

**NOV 9 2004**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MARCELL JERON NORMAN,

Defendant-Appellant.

No. 04-5010

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
**(D.C. NO. CR-03-69-C)**

Terry Lee Weber, Tulsa, Oklahoma, for Defendant-Appellant.

Leena M. Alam (David E. O'Meilia with her on the brief), United States
Attorney's Office, Tulsa, Oklahoma, for Plaintiff-Appellee.

Before **KELLY** , **BRISCOE** , and **TYMKOVICH** , Circuit Judges.

**TYMKOVICH** , Circuit Judge.

A jury convicted Marcell Jeron Norman on one count of possession of a

firearm after a felony conviction in violation of 18 U.S.C. § 922(g)(1). The sole

issue on appeal is whether the government presented sufficient evidence to allow

the jury to conclude that Norman constructively possessed the firearm found in the glove compartment of his car. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Finding that the government presented sufficient evidence of possession, we affirm.

## I. FACTUAL BACKGROUND

At 4:15 a.m. on December 27, 2002, Officer Antonia Hill of the Tulsa Police Department pulled her patrol car into a QuikTrip convenience store and parked next to a white 1991 Chevy Caprice, which was occupied by Marcell Jeron Norman. Norman sat in the driver's seat. After making eye contact with Officer Hill and turning down his music, Norman left the car and entered the convenience store. Officer Hill ran the car's license tag through the National Crime Information Center database and discovered that the car's registration had expired. (R.O.A. III, at 14–16) Norman and a friend who had been in the store, Curtis Hubbard, left the QuikTrip and returned to the car. Norman climbed into the driver's seat while Hubbard sat in the front passenger seat.

Officer Hill activated her emergency lights and initiated a traffic stop as Norman attempted to drive out of the parking lot. Norman immediately got out of his car and opened the vehicle's hood. According to Officer Hill's testimony, Norman's actions were sufficiently odd that she drew her weapon and told Norman to get back into the car and turn off the engine, which he did. Officer

Hill then asked for Norman's driver's license and insurance verification. He had neither. Regarding insurance verification, Norman explained that he had just purchased the car and had not yet had a chance to get insurance. Norman also told Officer Hill that although the car would be registered in his mother's name, the car actually belonged to him. (*Id.* at 21) Officer Hill arrested Norman for driving without a license. (*Id*. at 22)

Officer Thomas Fees arrived on the scene shortly after Norman's arrest. Officer Fees conducted a pre-tow inventory and search of the vehicle incident to Norman's arrest. Officer Fees noticed that the glove compartment was locked. Norman stated that he did not have a key to the glove compartment, and Officer Fees did not find a key during his search of the vehicle. Officer Fees then forced open the glove compartment where he found a loaded Glock 9 millimeter handgun.[1] Both Norman and Hubbard denied ownership of the handgun. (*Id.* at 44–46) The forensic laboratory did not find any fingerprints on the gun, magazine, or ammunition. (*Id*. at 71)

When Officer Hill first approached Norman's car, she testified that Hubbard had been seated calmly, eating a sandwich. In contrast, Norman appeared anxious, upset, and distraught throughout the encounter. (*Id.* at 24–25)

---

[1] The glove compartment was apparently easily opened without a key. Officer Fees testified, "I was able to get my fingers inside and pull it. It wasn't extremely difficult. I just pulled it open." (R.O.A. III, at 46)

-3-

As soon as Officer Fees found the gun, however, Hubbard's demeanor quickly changed from relaxed to extremely upset and surprised, and he stated, "I'm not getting in trouble for [Norman]." (R.O.A. III, at 58)

There was conflicting testimony at trial regarding whether Norman had exclusive possession of the car on the night and early morning of the arrest. Rutanya Simon, Hubbard's girlfriend, testified that she and Hubbard had driven in a Cadillac from Oklahoma City to Tulsa earlier that evening before Norman's arrest. According to Simon, Norman made the same drive from Oklahoma City to Tulsa in a white Caprice. Simon also testified that before the arrest, Norman picked up Hubbard in the same white Caprice. (*Id.* at 110–14) In contrast, Rachel White, a friend of Norman's, testified that she drove Norman from Oklahoma City to Tulsa on the evening of his arrest. According to White, she then dropped Norman off at Hubbard's house at approximately 1:00 a.m. on December 27, 2002, approximately three hours prior to Norman's arrest. White testified that she saw a 1991 Chevy Caprice parked in front of Hubbard's house. (*Id.* at 105) On cross-examination, however, the prosecutor impeached White by having her admit that Norman had given her money on multiple occasions since his arrest, that she had discussed her anticipated trial testimony with Norman's family, and that she was pregnant with Norman's child. (*Id.* at 106–09)

Finally, there was testimony that in February 2003, approximately two months after Norman's arrest, and while awaiting trial, Norman sold the white 1991 Chevy Caprice to Joshua Harris. Upon delivery of the car, which had the same Vehicle Identification Number as the car Norman was driving on the morning of his arrest, Norman gave Harris keys to the car, including a key to the glove compartment. Norman also told Harris that although title to the car was in his mother's name, the car actually belonged to him. (*Id.* at 90–91) This version of the car's ownership was consistent with what Norman told Officer Hill the night of the arrest.

The government charged Norman with knowing possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Norman pled not guilty to this offense and his case was submitted to a jury. The jury returned a guilty verdict, and Norman was sentenced to fifty-one months imprisonment.

**II. DISCUSSION**

*A. Standard of Review*

Sufficiency of the evidence to support a jury's verdict is a legal issue that is reviewed de novo. *See United States v. Avery*, 295 F.3d 1158, 1177 (10th Cir. 2002). "In order to conclude that the evidence was insufficient as a matter of law, [the court] must view the evidence and reasonable inferences therefrom in the light most favorable to the government and then determine that no rational

jury could have found Defendant guilty beyond a reasonable doubt." *United States v. Heckard*, 238 F.3d 1222, 1228 (10th Cir. 2001). Furthermore, we do not "question the jury's credibility determinations or its conclusions about the weight of the evidence." *United States v. Lazcano-Villalobos*, 175 F.3d 838, 843 (10th Cir. 1999).

*B. Sufficiency of the Evidence*

Norman argues on appeal that the evidence presented at trial did not support a conviction under § 922(g)(1). This section states in pertinent part:

(g) It shall be unlawful for any person—

> (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
> . . .
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

We have held that in order to prove a violation of § 922(g)(1), the government must establish the following elements beyond a reasonable doubt: (1) the defendant was previously convicted of a felony; (2) the defendant thereafter knowingly possessed a firearm or ammunition; and (3) the possession was in or affecting interstate commerce. *United States v. Colonna*, 360 F.3d 1169, 1178 (10th Cir. 2004) (citing *United States v. Taylor*, 113 F.3d 1136, 1144 (10th Cir. 1997)). Here, Norman challenges only the second element: knowing possession.

"Possession" can be either actual or constructive under § 922(g)(1). *United States v. Mills*, 29 F.3d 545, 549 (10th Cir. 1994). Constructive possession occurs when a person "knowingly holds ownership, dominion or control over the object and premises where it is found." *Lazcano-Villalobos*, 175 F.3d at 843. If the defendant has "exclusive possession of the premises," knowledge, dominion, and control are properly inferred. *Avery*, 295 at 1177 (quoting *Mills*, 29 F.3d at 549). However, if more than one person occupies the premises, the government must meet a higher burden. "In cases of joint occupancy, where the government seeks to prove constructive possession by circumstantial evidence, it must present evidence to show some connection or nexus between the defendant and the firearm or other contraband." *Mills*, 29 F.3d at 549. Furthermore, in order to sustain a conviction based on constructive possession in joint occupancy cases, the government must show "evidence supporting at least a plausible inference that the defendant had knowledge of and access to the weapon or contraband." *United States v. Hien Van Tieu*, 279 F.3d 917, 921 (10th Cir. 2002) (quoting *Heckard*, 238 F.3d at 1228). Thus, in the joint occupancy context, "*knowledge* and *access* are required to prove that the defendant knowingly held the power to exercise dominion and control over the firearm." *Colonna*, 360 F.3d at 1179 (citing *United States v. Gorman*, 312 F.3d 1159, 1164 (10th Cir. 2002)).

Norman argues that the government's evidence fails to show that he had knowledge of or access to the firearm. In particular, he points to the lack of direct evidence, such as fingerprints or testimony regarding how the firearm ended up in the glove compartment of Norman's car. App. Op. Br. at 5–7. He argues further that it is equally probable that the firearm belonged to Hubbard. *Id.* at 7. In making these arguments, however, Norman fails to take into account numerous pieces of circumstantial evidence that a jury could reasonably rely on in finding that he knowingly possessed the firearm.

Regarding knowledge, for example, Officers Hill and Fees both testified that Norman acted anxious and upset throughout his encounter with the police. Officer Hill also testified that upon arrest Norman quickly exited the car and opened the hood (the government argued to the jury that Norman likely hid the key to the glove compartment in the hood of the car). Norman's anxious demeanor and odd behavior support an inference that Norman had knowledge of the gun. In contrast to Norman's behavior, Hubbard sat calmly throughout the encounter, becoming agitated only when Officer Fees located the gun. Hubbard then quickly denied ownership of the gun and stated, "I'm not getting in trouble for [Norman]." ( R.O.A. III, at 58) The jury could infer from these facts that Norman knew that the gun was in the glove compartment, while Hubbard did not.

As to access, there are several facts that support Norman's possession of the gun. First, the fact that Norman was driving the car at the time of his arrest supports an inference that he had access to its contents, especially the locked glove compartment. Next, Norman told Officer Hill and Joshua Harris that the car belonged to him. The jury also heard testimony from Rutanya Simons that Norman had exclusive possession of the car on the night prior to his arrest. Although Rachel White gave contrary testimony, the issue of witness credibility is not ours to decide, but lies solely within the purview of the jury. *Hien Van Tieu*, 279 F.3d at 922. Finally, the record shows that Officer Fees testified that although the glove compartment was locked, it was easily opened.

Nevertheless, because the car was jointly occupied at the time of arrest, evidence of possession or ownership of the car is not enough to establish that Norman constructively possessed the weapon. But here, a "key" fact is the glove compartment key: in addition to evidence of possession and ownership, Norman also had the key to the glove compartment when he later sold the car to Joshua Harris. The key opened not only the glove compartment, but the car's doors and trunk as well. This fact along with the testimony regarding Norman's exclusive possession and ownership of the car supports the jury's determination of the needed "connection or nexus between the defendant and the firearm," *Mills*, 29

F.3d at 549, and supports a reasonable inference that Norman had access to the gun found in the glove compartment of his car.

Relying on *United States v. Gorman*, 312 F.3d 1159 (10th Cir. 2002), Norman places great weight on the fact that the glove compartment was locked. App. Op. Br. at 7 ("A reasonable jury could not have concluded that Marcell Norman had access to a locked glove compartment."). In *Gorman*, we held that evidence was sufficient to convict under § 922(g)(1) in part because the firearm was "visible and retrievable" by the defendant. 312 F.3d at 1164. While the accessibility of the weapon may be a factor to consider, a defendant may constructively possess a weapon under § 922(g)(1) even though that weapon is not readily accessible at the time of arrest. *See, e.g., Hien Van Tieu*, 279 F.3d at 922 (holding that defendant constructively possessed firearm located between the mattresses in his bedroom); *United States v. Merritt*, 361 F.3d 1005, 1014–15 (7th Cir. 2004) (holding that defendant constructively possessed firearms located in a locked vault); *Cf. Muscarello v. United States*, 524 U.S. 125, 126–27 (1998) (holding that the word "carried" in 18 U.S.C. § 924(c) extends to one who "knowingly possesses" a firearm, even where the firearm is placed in a locked glove compartment or trunk of a car).

### III. CONCLUSION

Viewed in the light most favorable to the government, the government provided ample evidence, taken together with the reasonable inferences therefrom, that Norman constructively possessed the firearm located in the glove compartment of his car.  We therefore AFFIRM.