FILED
United States Court of Appeals
Tenth Circuit

**January 24, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BALTAZAR MENDEZ,

Defendant - Appellant.

No. 06-3282

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 06-CR-10004-WEB)**

---

Carl F.A. Maughan, Maughan & Maughan, LC, Wichita, Kansas, for Defendant-Appellant.

William R. Mott, Special Assistant United States Attorney (Eric F. Melgren, United States Attorney, with him on the brief), District of Kansas, Wichita, Kansas, for Plaintiff-Appellee.

---

Before **TACHA, HOLLOWAY**, and **MURPHY**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

Baltazar Mendez was convicted of several counts of unlawful firearm and ammunition possession in violation of 18 U.S.C. §§ 922(g)(3) and 922(g)(5), and maintaining a residence for the purpose of storing, distributing and using

controlled substances in violation of 21 U.S.C. § 856(a)(2).  Mendez filed a

motion for a new trial based on alleged *Brady* and Confrontation Clause

violations, which the district court denied.  Mendez also moved for a judgment of

acquittal based on insufficient evidence to sustain a conviction.  The district court

granted the motion with respect to one charge and denied the motion with respect

to the remaining charges.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291,

this court **affirms** the district court.

## I.     Background

Mendez lived on Vassar Court in Wichita, Kansas.  On December 9, 2005,

agents from the Kansas Bureau of Investigation (KBI) and the Wichita Police

Department (WPD) obtained and executed a warrant on the residence.[1]

Once in the house, KBI agents uncovered weapons, drugs and items

commonly used in the sale of drugs.  In the southeast bedroom, officers found

drug-related items located in a dresser drawer, including plastic baggies,

electronic scales, and methylsufone, which is often used as a cutting agent for

methamphetamine.  Under the same dresser, officers found a nylon bag containing

a .380 handgun with a loaded magazine containing eleven rounds.  In the pocket

---

[1]About ten days earlier, a home invasion and kidnapping occurred in El Dorado, Kansas.  Through the course of the investigation, the police uncovered information that implicated Mendez and a second resident of the Vassar Court house in the El Dorado crime.  A search warrant was issued to the El Dorado, Kansas Police Department.  The El Dorado police requested the assistance of the Kansas Bureau of Investigations and the Wichita Police Department in the execution of the search warrant.

of a shirt hanging in the closet, officers discovered a baggie with a mixture containing over ten grams of methamphetamine. The mixture had a street value of about $1,000, but was possibly worth more if the drugs were further cut. Under the mattress of the bed, officers found a Springfield Arms shotgun and a notebook. The notebook contained the name "Mendez" in large letters written on the inside cover, along with other names next to figures containing dollar amounts, indicating a running total for various individuals. After testing, the government determined Mendez's fingerprints were on the notebook and it presented evidence that the notebook was a ledger used to keep track of drug transactions. Other documents belonging to the defendant were also uncovered in the southeast bedroom.

In a northwest bedroom, a Remington 12-gauge sawed-off shotgun was uncovered, with shotgun shells nearby. In the living room of the house, officers found documents bearing the defendant's name, including a driver's license and an energy bill. Inside an entertainment cabinet, between the living room and kitchen, multiple types of ammunition were located. Officers found a straw with a mirror in the kitchen, which later tested positive for cocaine. Several ecstacy pills were also found on top of the refrigerator. Mendez was arrested and agents found a glass smoking pipe and a .44 caliber bullet in his pocket.

Mendez waived his *Miranda* rights and agreed to talk with the police officers. He stated he lived at the Vassar Court residence, he had access to all

parts of the house, and that he had two roommates who paid him rent to stay at the residence. Mendez admitted the .380 handgun was his and that he kept it for protection because he had been robbed. He also admitted to regularly using and purchasing methamphetamine and sometimes using cocaine. Mendez used about 1/16 of an ounce of methamphetamine a day by smoking it through a pipe. He paid about $500 to purchase a half ounce every three to four weeks.

Mendez also admitted the following to the officers: he typically kept his methamphetamine in his shirt pocket; he sometimes slept in the one bed in the house and at other times on the couch; the electronic scales the agents found were his, and he used them to make sure he was not getting "ripped off" when he purchased his drugs; and he knew both shotguns were in the house, but disclaimed ownership. Mendez also told the agents he was born in Mexico in 1976 and provided the agents with a social security number, which was later shown to be false and invalid. Mendez gave the same false social security number to the Vassar Court landlord on his lease application.

On February 7, 2006, a grand jury returned a twelve-count superseding indictment. Mendez was charged with possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a) (Count 1); possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Count 2); possession of a Browning .380 caliber pistol while being an unlawful user of any controlled substance in violation of 18 U.S.C. § 922(g)(3)

(Count 3); possession of a Springfield Arms shot gun while being an unlawful user of any controlled substance in violation of 18 U.S.C. § 922(g)(3) (Count 4); possession of a Remington shotgun while being an unlawful user of any controlled substance in violation of 18 U.S.C. § 922(g)(3) (Count 5); possession of a .44 cartridge of ammunition while being an unlawful user of any controlled substance in violation of 18 U.S.C. § 922(g)(3) (Count 6); eluding inspection after entering the United States at a place other than designated by the government in violation of 8 U.S.C. § 1325(a)(1)-(2) (Count 7); possession of a Browning .380 pistol by an alien not lawfully in the United States in violation of 18 U.S.C. § 922(g)(5) (Count 8); possession of a Springfield Arms shotgun by an alien not lawfully in the United States in violation of 18 U.S.C. § 922(g)(5) (Count 9); possession of a Remington shotgun by an alien not lawfully in the United States in violation of 18 U.S.C. § 922(g)(5) (Count 10); possession of an unregistered firearm in violation of 26 U.S.C. §§ 5841 and 5861(d) (Count 11); and knowingly and intentionally managing and controlling a residence for the purpose of unlawfully storing, distributing and using a controlled substance in violation of 21 U.S.C. § 856(a)(2) (Count 12).

At trial, Immigration and Customs Enforcement ("ICE") Agent Carl Hummel testified that someone born in Mexico is usually a citizen of Mexico. He also testified that he ran a search in the U.S. ICE Central Index System, a nationwide database containing a record of documents used for entry into the

United States, such as permanent residence cards, border crossing cards, and certificates of naturalization. When Agent Hummel queried the database under Mendez's name, date of birth, and the social security number he provided the agents, there was no match.

The government also offered the testimony of the Vassar Court landlord, who explained he had leased the premises to Mendez's girlfriend, Anjelica Luna. Luna had contacted the landlord at a later time and asked that Mendez be added to the lease. The landlord usually received the rent directly from Mendez.

At the close of the government's case-in-chief, the court dismissed Count 11. The jury later acquitted Mendez on Counts 1 and 2. He was convicted on Counts 3 through 10 and Count 12. Mendez made a Rule 29 motion for acquittal based on insufficient evidence to sustain a conviction. Fed. R. Crim. P. 29. The district court granted the motion on Count 7, eluding inspection after illegally entering the United States, because there was no evidence the act had occurred within the five-year statute of limitations period. The court denied the motion on the remaining counts of conviction. Mendez also moved for a new trial, based on alleged *Brady* and Confrontation Clause violations. Fed. R. Crim. P. 33. The court denied the motion.

Mendez raises three arguments in this appeal.[2] First, he argues that the government impermissibly stacked inferences upon inferences to prove the firearm possession and alien status charges.[3] Second, Mendez claims the ICE database information, drug ledger, and statements of a "confidential informant" were inadmissible hearsay and violated the Sixth Amendment's Confrontation Clause. Third, he argues the government unlawfully withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

## II. Sufficiency of the Evidence

Mendez argues the government relied on an impermissible "crude stacking of inferences" to prove Mendez possessed the two shotguns and that he was an illegal alien. Specifically, he argues the government asked the jury to improperly

[2]Mendez also challenges his sentence, but concedes that the issue has been decided against him in *United States v. Dalton*, 409 F.3d 1247, 1252 (10th Cir. 2005) (explaining judicial fact-finding by a preponderance of the evidence remains constitutional post-*Booker* as long as the guidelines are advisory). Mendez filed an objection to the Presentence Investigative Report's finding that 101 grams of methamphetamine were found at his residence. Although Mendez was acquitted on the possession charge, the district court found by a preponderance of the evidence that he possessed 101 grams and sentenced him accordingly. Mendez argues this fact must be found by a jury, not the court. This panel has no authority to overrule *Dalton*. *See In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993) (per curiam).

[3]Mendez concedes there was sufficient evidence to sustain his conviction as to Counts 3 and 6. Although he does not specifically concede there is sufficient evidence to sustain a conviction as to Count 12, Mendez fails to make any arguments as to this conviction. Even if Mendez's arguments could be interpreted to include Count 12, a litigant who mentions a point in passing but fails to support it with pertinent authority forfeits the point. *See United States v. Callwood*, 66 F.3d 1110, 1115 n.6 (10th Cir. 1995).

infer that one resident of a house possesses all of the items belonging to any roommate who may also be dwelling in the same house. Further, Mendez identifies as reversible error the failure of the government to provide sufficient evidence that he was an illegal alien.

This court reviews sufficiency of the evidence de novo. *United States v. Stiger*, 413 F.3d 1185, 1193 (10th Cir. 2005). In reviewing the evidence, this court considers the entire record, including both direct and circumstantial evidence, together with the reasonable inferences to be drawn from it. *Id*. Evidence is sufficient to sustain a conviction if, when taken in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id*. "We rely on the jury, as the fact finder, to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented." *Id*. at 1194 (citation and quotation omitted).

### A.    *Possession of Firearms*

Mendez argues the government failed to prove that he possessed the Springfield Arms and Remington shotguns charged in Counts 4, 5, 9 and 10 of the indictment. Mendez relies on *United States v. Jones*, 49 F.3d 628, 632 (10th Cir. 1995) for the proposition that the government may not rely on inferences alone to convict a defendant. In *Jones,* the government failed to introduce evidence that directly linked the defendant to the drugs and guns the police uncovered when they searched a rental car in which Jones was traveling. *Id*. at 631. The

government's key witness, another passenger in the car, never saw the defendant with the gun or the drugs, but testified that Jones was standing with a third passenger, Mr. Brown, while Brown looked under the dashboard and hood of the car and spent some time in the trunk, as if looking for a place to hide the guns and drugs. *Id*. The government also offered evidence that two of Jones' travel companions flew to Los Angeles but were driving back to Denver, and that Jones never offered a valid reason for traveling to Denver. *Id.* The court determined that all of the evidence against Jones was circumstantial. The flaw in *Jones* was that the jury was required to draw an inference from an inference to convict Jones. *Id.* at 633. Unlike *Jones*, the government here offered significant evidence which directly connected Mendez to the firearms, as well as evidence proving he was not in the United States legally.

The element of possession may be satisfied by either a showing of actual or constructive possession. *United States v. Norman*, 388 F.3d 1337, 1340 (10th Cir. 2004). Constructive possession occurs when a defendant "knowingly holds ownership, dominion or control over the object and premises where it is found." *Id*. (quotation omitted). If a defendant has exclusive possession of the premises at issue, knowledge, dominion and control are properly inferred. *Id*. In cases of joint occupancy, however, the government must present evidence to show some connection or nexus between the defendant and the firearm. *Id.* at 1341. There

-9-

must be at least a plausible inference that the defendant had access to and knowledge of the weapon. *Id.*

The district court found that under this standard, the government presented sufficient evidence from which a jury could properly find the element of possession had been satisfied for Counts 4 and 9 (possession of the Springfield Arms shotgun) and Counts 5 and 10 (possession of the Remington shotgun). As to the Springfield Arms shotgun, the court considered evidence showing the defendant was the primary tenant at the residence, the appearance of his name on the lease and utilities and his exercise of dominion and control over the residence. Evidence was offered to show that Mendez had knowledge of the methamphetamine and other drug-related items in the southeast bedroom, as well as the .380 handgun hidden under the dresser. Mendez admitted having knowledge of the Springfield Arms shotgun, which was located under the mattress. Further, the court pointed to the drug ledger, on which the defendant's fingerprints were found, located under the same mattress. Mendez admitted sleeping in this bed, indicating the defendant occupied this room and had knowledge of its contents.

The district court then examined the evidence to support the conviction as to Counts 5 and 10 for the Remington 12-gauge shotgun, including the location where it was found, sitting out on the floor of the other bedroom. Because the gun was accessible to anyone in the house, the jury could reasonably infer that

anyone using the room had knowledge of and access to the gun. Additionally, the government offered evidence that the defendant admitted to knowing the gun was in the house. Further, evidence was introduced that ammunition and weapons were found throughout the house and that Mendez exerted general control and dominion over the residence. The district court determined the prosecution had not engaged in an impermissible "stacking of inferences," but rather put into evidence a series of related facts each of which tended to prove Mendez had knowledge of and access to the firearms, as well as the ability and intention to control them.

The district court did not err. This case stands in stark contrast to *Jones*. Unlike *Jones*, where the prosecution never established the defendant had knowledge of the weapon hidden in the trunk of the rental car, Mendez admitted to the KBI agents and WPD officers that he knew both shotguns were in the house. Further, based on the evidence presented at trial, Mendez had access to the weapons. He slept on the bed under which the Springfield Arms shotgun was recovered and the Remington 12-gauge shotgun was sitting out in the open. When viewed in the light most favorable to the government, a reasonable jury could find that the defendant had constructive possession of both the Remington and Springfield Arms shotguns.

-11-

### B.    *Evidence of Illegal Status*

Next, Mendez argues the government failed to prove that he was an alien in the United States illegally.  This finding was an essential element of Counts 8, 9 and 10, which charged the defendant with being an alien unlawfully in the United States in possession of a firearm or ammunition, in violation of 18 U.S.C. § 922(g)(5)(A).  An "alien" is defined as any person who is not a citizen or national of the United States.  8 U.S.C. § 1101(a)(3).  The government may prove an alien was unlawfully in the United States by showing he was in this country without authorization.  *See United States v. Atandi*, 376 F.3d 1186, 1189 (10th Cir. 2004).

Mendez argues the government failed to meet its burden of proving he was an alien.  He contends the only evidence upon which the jury could rely was his admission that he was born in Mexico.  The government, however, also introduced evidence that Mendez provided officers with a false social security number after his arrest and that it had no evidence of a valid authorization to lawfully enter the country.  This evidence, when considered with the evidence that Mendez was born in Mexico, could lead a reasonable jury to conclude that Mendez was not lawfully present in the United States.  The district court did not err and the evidence was sufficient to support Mendez's conviction.

## III. Confrontation Clause

Mendez also asserts that evidence introduced at trial violated his Sixth Amendment confrontation right and was inadmissible hearsay. This court reviews de novo the legal question of whether evidence at trial violates the Confrontation Clause. *United States v. Summers*, 414 F.3d 1287, 1298 (10th Cir. 2005). We review a decision to admit evidence that does not implicate the Constitution for abuse of discretion. *United States v. Dowlin*, 408 F.3d 647, 659 (10th Cir. 2005).

The Confrontation Clause prohibits the admission of testimonial hearsay unless the declarant is unavailable and there was a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The *Crawford* Court declined, however, to provide a comprehensive definition of "testimonial" but indicated it includes, at a minimum, prior testimony at a preliminary hearing, before a grand jury, at a former trial, and statements made during police interrogations. *Id*. In *Davis v. Washington*, the Supreme Court further developed the scope of "testimonial," holding:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

126 S. Ct. 2266, 2273-74 (2006).

-13-

Similarly, this court has held that "a statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime." *Summers*, 414 F.3d at 1302. We employ a multi-part inquiry to determine if the right to confrontation has been violated. *Id*. at 1299. We examine (1) whether the challenged evidence is hearsay; (2) whether it is testimonial; and (3) if the evidence is testimonial hearsay, whether its introduction was harmless error. *Id*. at 1299-1303.

Mendez challenges the introduction of three pieces of evidence, arguing they were inadmissible hearsay and their introduction violated his confrontation rights. He challenges the information from the ICE database, the drug ledger, and statements of a "confidential informant."

### A.    *ICE Database*

At trial, Agent Hummel testified that he performed a search of the ICE database, known as the Central Index System. He testified that the Central Index System is a nation-wide database of information which archives records of entry documents, such as permanent resident cards, border crossing cards, or certificates of naturalization. Agent Hummel performed a search of the database using Mendez's name and the social security number Mendez provided officials at the time of his arrest and found no match, indicating that Mendez had not entered the country legally. Mendez challenges Agent Hummel's testimony and the

underlying database records. He argues the testimony violated his Sixth Amendment right to confront his accuser and is inadmissible hearsay.

Agent Hummel's testimony is not hearsay because he testified in court. Fed. R. Evid. 801(c) ("Hearsay is a statement, other than one made by the declarant *while testifying at the trial* or hearing, offered in evidence to prove the truth of the matter asserted." (emphasis added)). In a recent unpublished decision this court stated that in cases in which a Certificate of Non-Existence Record ("CNR") is introduced into evidence to prove a person did not legally enter the country, the declarant is the person who actually performed the data search and did not discover a record pertaining to the defendant. *United States v. Salinas-Valenciano*, 220 F. App'x 879, 883 (10th Cir. 2007) (unpublished)[4]; *see also United States v. Valdez-Maltos*, 443 F.3d 910, 911 (5th Cir. 2006) (holding as long as an immigration official testifies at trial about the absence of entry documents and the relevant circumstances indicate an adequate search was performed, the testimony is not hearsay), *cert. denied*, 127 S. Ct. 265 (2006). We agree. In this case, no CNR was received into evidence, but rather Agent Hummel took the stand and testified to the search he ran. Because the Confrontation Clause "restricts only statements meeting the traditional definition

_____

[4]"Unpublished decisions are not precedential, but may be cited for their persuasive value." 10th Cir. R. 32.1.

of hearsay," Agent Hummel's in-court testimony did not violate the Sixth Amendment. *United States v. Faulkner*, 439 F.3d 1221, 1225 (10th Cir. 2006).

Mendez also challenges the underlying database embedded in Agent Hummel's testimony. The ICE database, containing records of requests for permission to reenter, is a public record. The Federal Rules of Evidence define public records as "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to a duty imposed by law as to which matters there was a duty to report . . . ." Fed. R. Evid. 803(8)(A)-(B). Excluded from this definition are matters observed by police officers or other law enforcement personnel in criminal cases. Fed. R. Evid. 803(8)(B). This exclusion applies when law enforcement personnel create records for the purpose of prosecution. *See United States v. Bohrer*, 807 F.2d 159, 162 (10th Cir. 1986). Even if ICE personnel are classified as law enforcement, the U.S. Central Index System is created in connection with ongoing regulatory functions independent of prosecution and public officials are under a duty to accurately create records. *See* 8 U.S.C. §§ 1101, 1103, 1304; 8 C.F.R. §§ 103.1, 264.1.

Under the Federal Rules of Evidence, the absence of a public record or the nonoccurrence of a matter for which a record is regularly made is not excluded by the rule against hearsay. Fed. R. Evid. 803(10). The rule "includes situations in which the absence of a record may itself be the ultimate focal point of the

inquiry," as was the case here. Fed. R. Evid. 803(10) advisory committee's note. Evidence that the ICE database did not contain a record for Mendez is therefore admissible under the Rule 803(10) exception.

As a public record, the ICE Central Index System is not testimonial. The definition of "public record" in Rule 803(8)(B) excludes records created with an eye toward litigation and criminal prosecution. *Bohrer*, 807 F.2d at 162. *Crawford* suggests the very same characteristics that preclude a statement from being classified as a public record are likely to render the statement testimonial. 541 U.S. at 56 n.7 (describing testimonial as statements produced through the "[i]nvolvement of government officers" and made "with an eye toward trial"). Where records are not prepared for litigation or criminal prosecution, but rather administrative and regulatory purposes, the "principal evil at which the Confrontation Clause was directed" is not implicated. *Id*. at 50.

*Crawford* suggests public records and business records fall outside the testimonial ambit of the Confrontation Clause. *Id*. at 76 (Rehnquist, C.J., concurring); *see also id.* at 56 ("Most of the hearsay exceptions covered statements that by their nature were not testimonial-for example, business records or statements in furtherance of a conspiracy."). Other circuits addressing this issue have held public records are not testimonial. *See United States v. Torres-Villalobos*, 487 F.3d 607, 613 (8th Cir. 2007) (holding warrants of deportation are public records and not testimonial); *United States v. Feliz*, 467 F.3d 227, 237 (2d

Cir. 2006) (holding autopsy reports are public records and not testimonial), *cert. denied*, 127 S. Ct. 1323 (2007); *United States v. Weiland*, 420 F.3d 1062, 1076-77 (9th Cir. 2005) (holding records of conviction and routine certifications of public records are not testimonial), *cert. denied*, 547 U.S. 1114 (2006); *United States v. Lopez-Moreno*, 420 F.3d 420, 437 (5th Cir. 2005) (holding ICE computer records are public records and not testimonial), *cert. denied*, 546 U.S. 1222 (2006).  We therefore hold the ICE database is not testimonial and not subject to the strictures of the Confrontation Clause.

### B.     Drug Ledger

Mendez objected to the admission of the drug ledger on hearsay and Confrontation Clause grounds.  The notebook contained lists of names with dollar amounts.  These statements were offered not for the truth of the matter asserted, i.e., that these individuals actually owed this money, but rather to show the notebook was a drug ledger, and therefore a "tool of the trade."  *See United States v. Gonzalez*, 307 F.3d 906, 910 (9th Cir. 2002) (holding where prosecutors sought to introduce pay/owe sheets as a tool of the trade the evidence was not hearsay); *United States v. Jaramillo-Suarez*, 950 F.2d 1378, 1383 (9th Cir. 1991) (holding admission of a pay/owe sheet "for the specific and limited purpose of showing the character and use of" an apartment does not implicate the rule against hearsay). Like the scales, baggies, drugs, and weapons found throughout Mendez's

residence, the ledger is a "tool of the trade" and was introduced as an item common to the practice of selling drugs.

The notebook also contained the name "Mendez" on the inside front cover. In *United States v. Ashby*, this court held a car title listing the defendant as the owner was not inadmissible hearsay where it was used to tie the defendant to a car used for drug running, not to prove that she owned the car. 864 F.2d 690, 693 (10th Cir. 1988). Likewise, the evidence in this case was not used to show that Mendez owned the drug ledger, but rather it was introduced to tie him to the illegal drug activity.

Even if the drug ledger constituted hearsay, in no way does this evidence implicate the Confrontation Clause. Mendez argues the author of the drug ledger would have known at some point that, if discovered, the ledger would have been used in a criminal prosecution thereby implicating *Davis'* definition of "testimonial." *Davis* was concerned with statements made to police during emergency 911 calls and focused on whether the primary purpose of an interrogation is to enable police assistance to meet an ongoing emergency. *Id.* at 2270-74. If it is, the statement is nontestimonial. *Id.* If, however, the primary purpose is to establish or prove past events relevant to later criminal prosecution, the statement is testimonial. *Id.*

That a piece of evidence may become "relevant to later criminal prosecution" does not automatically place it within the ambit of "testimonial." At

no point did the author keep the drug ledger for the *primary purpose* of aiding police in a criminal investigation, the focus of the *Davis* inquiry. Under Mendez's reading of *Crawford* and *Davis* any piece of evidence which aids the prosecution would be testimonial and subject to Confrontation Clause scrutiny. Such an interpretation is antithetical to the logic of the Confrontation Clause, the Supreme Court's precedent, and this circuit's case law. It therefore must fail.

### C. Statements of "Confidential Informant"

Finally, Mendez argues that the district court impermissibly allowed a KBI agent to testify as to statements a confidential informant made to him regarding the investigation of the El Dorado kidnapping and home invasion. Agent Bumgarner testified on cross-examination about the reason a search warrant was issued for the Vassar Court residence. At no time did Agent Bumgarner testify about statements made to him by a confidential informant. His testimony was not hearsay, nor was Mendez's right to confront his accusers violated by this testimony.

## IV. Brady Violation

Mendez sought a new trial under Rule 33 of the Federal Rules of Criminal Procedure, alleging, *inter alia*, a *Brady* violation. The Supreme Court held in *Brady v. Maryland* "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

prosecution." 373 U.S. 83, 87 (1963). A defendant seeking a new trial must show that "(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material." *United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir. 1999). This court reviews de novo a claim of failure to disclose evidence in violation of *Brady*. *United States v. Velarde*, 485 F.3d 553, 558 (10th Cir. 2007).

During the trial, Mendez's counsel discovered that certain field notes taken by the lead KBI agent had not been turned over to the defense, despite the fact these materials had been included in Mendez's pretrial discovery request. When the KBI agent testified about the field notes during the trial, Mendez's counsel asked to be provided with the notes and for a recess to review them. The government provided Mendez with a copy and a recess was taken. Counsel reviewed the notes and subsequently used them during his cross-examination of the KBI agent.

In his motion for new trial and on appeal Mendez fails to identify any evidence in the field notes that is exculpatory or material. Evidence is "material" under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Robinson*, 39 F.3d 1115, 1118 (10th Cir. 1994) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Mendez has not

-21-

made this showing.  Further, the material was actually disclosed to the defense and used during cross-examination.  Although this court strongly disapproves of delayed disclosure of *Brady* materials, "[a]s long as ultimate disclosure is made before it is too late for the defendant to make use of any benefits of the evidence, Due Process is satisfied." *United States v. Warhop*, 732 F.2d 775, 777 (10th Cir. 1984) (quotation and alteration omitted).  Therefore, reversal is not warranted.

## V.    Conclusion

The judgment of the district court denying Mendez's motion for a new trial and denying in part his motion for judgment of acquittal is **affirmed**.