In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00140-CV


______________________________





IN RE: SUSAN WOODS








 


Original Mandamus Proceeding









 
 



Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Carter








MEMORANDUM OPINION



 Susan Woods seeks an order from this Court directing the 71st Judicial District Court of
Harrison County, Texas, to withdraw its order severing her medical malpractice claim against
Dr. Edward Liu from Woods' remaining claims against various parties. On March 4, 2009, we
abated the proceedings in this case pursuant to Tex. R. App. P. 7.2 and In re Baylor Medical Center
at Garland, No. 06-0491, 2008 WL 3991132 (Tex. Aug. 29, 2008) (orig. proceeding). During the
abatement period, the trial court reconsidered the at-issue severance motion and ultimately denied
it.

 The basis for Woods' petition for writ of mandamus has been resolved in her favor by the trial
court. Accordingly, we dismiss her petition as moot.



 Jack Carter

 Justice


Date Submitted: April 14, 2009

Date Decided: April 15, 2009



xception Locked="false" Priority="39" Name="toc 2"/>
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 












 
 
 
 
 
 
 




 

 

 

 

 

 

 

 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00221-CR

                                                ______________________________

 

 

                        KAREN MICHELLE WOOLVERTON,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                         On Appeal from the 5th Judicial District Court

                                                             Bowie County, Texas

                                                       Trial Court
No. 08F0746-005

 

                                                      
                                            

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                                        Opinion by Justice Moseley








                                                                   O P I N I O N

 

            Karen
Michelle Woolverton was convicted by a Bowie County jury of possession[1]
and manufacture[2]
of a controlled substance, methamphetamine, and was sentenced to ten years and
forty years confinement, respectively, in the Texas Department of Criminal
Justice.  Both sentences are to run
concurrently.  On appeal, Woolverton
contends that the trial court erred in (1) admitting evidence obtained
through a warrantless search of a residence occupied by her as a co-tenant
without her consent and (2) admitting an unauthenticated journal into evidence
over trial counsels hearsay objection. 
Because we find no error on the part of the trial court, we affirm the
convictions.  

I.          FACTS

            After having
received information from their supervisor that illegal narcotics activity was
taking place at a residence located outside of New Boston, Bowie County Sheriffs
Deputies Stacey Sumner and Nathan Head traveled to the residence, a single-wide
manufactured home, to investigate. 
Sumner testified that he knew that an individual, Todd Copeland, owned
and occupied the residence.  When Sumner
and Head arrived at the residence, Copeland came outside to speak with them,
meeting them at the gate to the property; he then confirmed that he was the
owner of the residence.  At that time,
Sumner requested Copelands consent to search the residence.  Copeland agreed and provided written consent
for the search, then returning to the residence and retrieving the remote
control to open the gate to the property. 
When Sumner and Head entered the residence, they encountered Woolverton,
who queried the officers regarding their reason for their presence in the
house.  

            There
is a conflict in the testimony as to what occurred at this point in time.  Whereas Sumner testified that Woolverton
never denied permission to search the residence and that the issue of
Woolvertons consent never arose at that time,[3]
Woolverton testified to the contrary. 
She contended that when the officers informed her they had obtained
Copelands permission to conduct the search and requested that she exit the
premises while the search was conducted, she responded, I didnt give anybody
consent to search and, Im refusing a search of anything of mine unless you
can tell me why youre here and show me a search warrant. 

            Upon
a search of the residence, an operational methamphetamine laboratory was
discovered.  Lance Cline, an agent with
the Texas Department of Public Safety Criminal Investigation Division, was
contacted.  Upon his arrival, Sumner
advised Cline of Copelands consent to the search.  Prior to entering the residence, Cline
likewise sought Copelands consent to search, which was freely given.  At that time, Cline interviewed Woolverton,
whose face appeared to be sunken, and who was thin and pale.  Cline believed Woolverton lived in the
residence, because he had previously received information that she had been
contacting a website attempting to have ephedrine sent to that address.[4]  Woolverton confirmed Clines belief when she
indicated she lived in the residence; further, there were womens clothes on
site and Copeland confirmed that she resided there with him.  Cline indicated that Woolverton did not voice
any objection to him of the search.  After
having been advised of her Miranda[5]
rights, Woolverton provided Cline information for a statement in which she
indicated that she knew methamphetamine was being manufactured at the residence
and that she used methamphetamine; she, nevertheless, maintained that the
methamphetamine and manufacturing paraphernalia belonged to Copeland and
others.[6]  Numerous items located at the residence,
including methamphetamine, paraphernalia associated with manufacturing
methamphetamine, and a drug ledger were confiscated and introduced as evidence
at Woolvertons trial.

II.        ANALYSIS

            A.        Consent to Search  

            Prior
to trial, Woolverton filed a motion to suppress all evidence obtained from the
residence, alleging that the evidence was seized as the result of a warrantless
search without probable cause and without her consent, in violation of her
constitutional rights under the Fourth and Fourteenth Amendments to the United
States Constitution, Article I, Section 9, of the Texas Constitution, and in
violation of Article 38.23 of the Texas Code of Criminal Procedure.  Tex.
Code Crim. Proc. Ann. art. 38.23 (Vernon 2005).  In lieu of ruling prior to trial on
Woolvertons motion to suppress, the trial court granted Woolvertons running
objection to the introduction of the fruits of the search, withholding any
ruling on the motion subsequent to presentation of the evidence.  At the conclusion of the evidence, the trial
court denied Woolvertons motion to suppress. 


            A
trial courts decision to grant or deny a motion to suppress evidence is
reviewed under a bifurcated standard of review. 
Ford v. State, 158 S.W.3d 488,
493 (Tex. Crim. App. 2005).  The general
rule is that an appellate court should afford almost total deference to a trial
courts determination of the historical facts supported by the record,
especially when the trial courts fact findings are based on an evaluation of
credibility and demeanor.  Guzman v.
State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  At a suppression hearing,
the trial court is the exclusive trier of fact and judge of the credibility of
the witnesses.  State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).  We are also to afford such deference to a
trial courts ruling on application of law to fact questions, also known as mixed
questions of law and fact, if the resolution of those questions turns on an
evaluation of credibility and demeanor.  Guzman,
955 S.W.2d at 89.  [W]hether a third
party had actual authority to consent to a search of anothers property and
whether an officer was reasonable in finding that a third party had apparent
authority to consent are mixed questions of law and fact which reviewing courts
should examine de novo.  Hubert v. State, 312 S.W.3d 554, 55960
(Tex. Crim. App. 2010).  Where findings
of fact are not entered, we view the evidence in the light most favorable to
the trial courts ruling and assume the trial court made implicit findings of
fact that support its ruling as long as those findings are supported by the
record.  Valtierra v. State, 310 S.W.3d 442, 447 (Tex. Crim. App.
2010).  We review the application of the
law of search and seizure to the facts de novo. 
If the trial courts ruling is reasonably supported by the record and
is correct on any theory of law applicable to the case, we are not at liberty
to disturb that ruling.  State v. Dixon, 206 S.W.3d 587, 590
(Tex. Crim. App. 2006).   

            The
issue before the trial court was one of whether a search warrant was necessary
in light of the written consent to search given by Copeland, a cotenant of the
premises.  We begin with the presumption
that a warrantless entry by police into a persons home is unreasonable under
the Fourth Amendment,[7]
which protects individuals against unreasonable searches and seizures, unless
the entry falls within an exception to the warrant requirement.  Valtierra,
310 S.W.3d at 448.  A warrantless search
made without probable cause is valid under the Fourth Amendment with proper
consent, voluntarily given.  United States v. Matlock, 415 U.S. 164,
16566 (1974).  Consent to search must
be shown to be positive and unequivocal, and there must not be any duress or
coercion.  Allridge v. State, 850 S.W.2d 471, 493 (Tex. Crim. App. 1991).  

            It
is undisputed that Copeland signed a written consent to search the house
located at 244 CR 4102 along with the outer buildings and perimeter
thereof.  No issue has been raised with
respect to the voluntariness of Copelands consent.  Rather, Woolverton contends that because she
informed the officers that she, too, lived in the residence, and she did not
consent to the search, it was then incumbent on the officers to obtain a
warrant in order to conduct a valid search of the residence and premises under
the Fourth Amendment. 

            The
Fourth Amendment recognizes a valid warrantless entry and search of premises
when police obtain the voluntary consent of an occupant who shares, or is
reasonably believed to share, authority over the area in common with a co-occupant
who later objects to the use of evidence so obtained.  Georgia
v. Randolph, 547 U.S. 103, 106 (2006); accord
Patrick v. State, 906 S.W.2d 481, 490
(Tex. Crim. App. 1995).  A third party
may give consent to search property over which they have joint access or
control.  Patrick, 906 S.W.2d at 490.  Where
cotenants or joint occupants live at a residence, either tenant may give the
law enforcement officer consent to search the premises so long as that tenant
has control over and authority to use the premises.  Randolph,
547 U.S. at 106; Jones v. State, 119
S.W.3d 766, 787 (Tex. Crim. App. 2003) (A third person may validly consent to
a search when he has equal control and equal use of the property searched.
(quoting Welch v. State, 93 S.W.3d
50, 5253 (Tex. Crim. App. 2002)).

            The
question here, as in Randolph, might
have been whether such evidentiary seizure is lawful with the permission of one
occupant when the other, who later seeks to suppress the evidence, is present
at the scene and expressly refuses consent. 
The Randolph court determined,
under the facts presented in that case, that the co-occupants stated refusal
to permit entry prevails, rendering the warrantless search unreasonable and
invalid as to him.  Randolph, 547 U.S. at 106. 
In arriving at this conclusion, the Court reasoned that:

Since the co-tenant wishing to open the door to a
third party has no recognized authority in law or social practice to prevail
over a present and objecting co-tenant, his disputed invitation, without more,
gives a police officer no better claim to reasonableness in entering than the
officer would have in the absence of any consent at all.  Accordingly, in the balancing of competing
individual and governmental interests entailed by the bar to unreasonable searches,
the cooperative occupants invitation adds nothing to the governments side to
counter the force of an objecting individuals claim to security against the
governments intrusion into his dwelling place.  Since we hold to the centuries-old principle
of respect for the privacy of the home, it is beyond dispute that the home is
entitled to special protection as the center of the private lives of our
people.  We have, after all, lived our
whole national history with an understanding of the ancient adage that a mans
house is his castle [to the point that t]he poorest man may in his cottage bid
defiance to all the forces of the Crown. 

 

Id. at 11415 (citations omitted). 

            Moreover,
disputed permission to search is no match for this central value of the Fourth
Amendment, and the States other countervailing claims do not add up to
outweigh it.  Id. at 11516.  The Court
therefore held that a warrantless search of a shared dwelling for evidence
over the express refusal of consent by a physically present resident cannot be
justified as reasonable as to him on the basis of consent given to the police
by another resident.  Id. at 120.

            However,
unlike Randolph (where the
nonconsenting inhabitants refusal was clear and undisputed), the question of
whether Woolverton refused to consent to the search is disputed in this
case.  Woolverton is unequivocal in her
testimony that such refusal was communicated to Sumner, with Head standing in
the doorway.  Sumner, on the other hand,
is equally unequivocal in his testimony that Woolverton made no objection to
the search.  When asked by the State if
Woolverton ever told Sumner he could not search, Sumner stated that Woolverton
made no such objection.  Sumner further
testified that when Woolverton was asked to vacate the residence, she complied
without ever communicating to Sumner the fact that she lived in the
residence.  While Sumner did learn that
Woolverton resided at the residence after he arrived on the premises, he did
not proactively seek her consent because Copeland had previously provided
written consent to search.  

            Head
testified that he witnessed Sumner obtain Copelands written consent to search
the residence and surrounding buildings. 
Head and Sumner were then unaware of Woolvertons presence in the
residence and did not learn of it until after the consent had already been
signed and they entered the residence. 
Head testified that he had no knowledge of whether Woolverton was asked
for consent to search and did not himself seek consent for the search from
Woolverton.  Cline testified that after
he arrived, he interviewed Woolverton; during that interview, Woolverton never
indicated to Cline that she was withholding consent to search.  In fact, Woolverton indicated that she knew
methamphetamine was being manufactured at the residence and that she had used
methamphetamine.  

            After
having heard the conflicting testimony regarding Woolvertons lack of consent
to search, the trial court stated:

[T]he Georgia case is clear that consent to search
by one owner or occupant of the residency [sic] is sufficient unless the other
owner or occupant objects, and in that particular case, it was, there was a
domestic dispute.  The wife, co-owner of
the house, gave consent to the officers to search the residence while the
husband vigorously objected.  

 

            In
this case, it comes down to a credibility determination and the Court finds
that the testimony of the defendant in this case is not credible and the Court
finds that the testimony of the officers is credible, that she did not object,
that she was cooperative, that she did not even inform them that she resided
there, although I think there was some testimony by one of the officers that he
knew that.  But she never objected to the
search. 

 

. . . . 

 

[T]he Court finds that the defendant, Karen
Woolverton, was physically present but does not find that she refused
consent.  Therefore, the consent given by
Mr. Copeland was sufficient to serve as an exception to the warrant
requirement and the motion to suppress is denied.

 

            The
trial court correctly applied the law of search and seizure to the facts of
this case.  The resolution of the issue
of whether a warrant was, in fact, required in order to search the premises in
question rests upon the issue of whether Woolverton refused consent to the
search.  This issue turned on the
credibility and the demeanor of the witnesses. 
Because the findings of the trial court are based on an evaluation of
credibility and demeanor of the witnesses, we defer to those findings as they
are supported by the record.  Guzman,
955 S.W.2d at 89.  We overrule this point
of error.

            B.        Admissibility
of the Drug Ledger

            In her second
point of error, Woolverton contends that the trial court abused its discretion
by admitting an unauthenticated journal into evidence over trial counsels
hearsay objection.  A trial courts
admission or exclusion of evidence is reviewed under an abuse of discretion
standard. Torres v. State, 71 S.W.3d
758, 760 (Tex. Crim. App. 2002); see also
Coffin v. State, 885 S.W.2d 140, 149 (Tex. Crim. App. 1994) (holding that
ruling on admissibility of out-of-court statement under hearsay exception is
within trial courts discretion, subject to review only for abuse of
discretion).

            Hearsay
is a statement, other than one made by the declarant while testifying at the
trial or hearing, offered in evidence to prove the truth of the matter
asserted.  Tex. R. Evid. 801(d); see
also Tex. R. Evid. 801(c).  A statement not offered to prove the truth of
the matter asserted is not hearsay.  Dinkins v. State, 894 S.W.2d 330, 34748
(Tex. Crim. App. 1995) (holding that appointment book and patient application
form were not hearsay when tendered . . . to show how appellant became a
suspect in the investigation, not for the truth of the matter asserted).

            At
trial, the State offered into evidence a pink notebook, containing handwritten
drug ledger information.  Woolverton
objected to the admission of the notebook as hearsay.  In overruling Woolvertons objection, the
trial court determined that the notebook was not being offered for the truth of
the matter asserted, and thus was not hearsay. 
Woolverton maintains the notebook was indeed offered to prove the truth
of the matters asserted therein.  Clines
testimony provided a detailed outline of the meaning of the entries in the
notebook,[8]
which contains initials and details of drug transactions.  Cline described the pink notebook as a drug
ledger that he found inside the residence and opined that the presence of the
drug ledger indicates that drug sales were occurring at the location where it
was found. 

            Although
we find no Texas or Fifth Circuit cases addressing this particular issue, many
courts have allowed the introduction of drug ledgers, not for the truth of
the entries on the ledgers, but as circumstantial evidence that drug-related
activities were occurring on the premises where the records were found.  In United
States v. Wilson, 532 F.2d 641, 64546 (8th Cir. 1976), the court ruled
that certain records that were found on the premises where the prosecution
alleged that drug trafficking was occurring were admissible as circumstantial
evidence that drug trafficking was occurring on the premises.  In United
States v. Mendez, 514 F.3d 1035, 1045 (10th Cir. 2008), a drug ledger
containing lists of names with dollar amounts was admitted into evidence over
the defendants hearsay objection.  The
court determined that these statements were offered not for the truth of the
matter asserted (i.e., that particular individuals actually owed money);
rather, the lists were admitted to show that the notebook was a drug ledger,
and therefore a tool of the trade.  Id.; see
also United States v. Gonzales, 307 F.3d 906, 910 (9th Cir. 2002) (where
prosecutors sought to introduce pay/owe sheets as tool of the trade, the
admission did not implicate the rule against hearsay when admitted for limited
purpose of showing the character and use of an apartment).  

            In
the case at bar, Cline collected copious evidence related to the possession and
manufacture of methamphetamine at the residence in question.  Such evidence included three pistols, a trash
can containing discarded items often associated with methamphetamine production,
numerous receipts for pseudoephedrine, a shopping list of what is needed to get
a methamphetamine cook started, three glass pipes for smoking
methamphetamine, a box of Actifed Cold & Allergy medication (a common
source for pseudoephedrine), a bottle of iodine (necessary in the processing of
methamphetamine), a methamphetamine test kit, methamphetamine, camping fuel (a
solvent used in the manufacture of methamphetamine), an apparatus through which
methamphetamine was smoked, muriatic acid (used in the manufacture of
methamphetamine), a hydrogen peroxide bottle fashioned into a hydrogen chloride
generator, scales with visible yellow residue (commonly found in a
methamphetamine laboratory), a huge jug of sulfuric acid and jar tops with
holes for tubing (both items commonly used in the manufacture of
methamphetamine), and a broken Erlenmeyer flask (a piece of glassware often
found in a methamphetamine laboratory).  

            Like
the other items of evidence found throughout the residence, the drug ledger
here is a tool of the trade and is an item commonly associated with the
practice of trading in illegal narcotics. 
The record does not indicate that the ledger was used to prove
particular drug transactions that were elements of extraneous crimes or of any
type of drug conspiracy.[9]  Thus, the drug ledger was not admitted to
prove the truth of the matters asserted therein.  That is, the initials and other entries in
the ledger were not admitted to show the persons whose initials were listed
therein actually owed the amount of money listed or purchased the quantities of
drugs listed; rather, they were admitted to show that this drug ledger is a
tool of the drug dealing trade, and thus is circumstantial evidence that drug
trafficking was occurring on the premises. 
We find no abuse of discretion on the part of the trial court in
admitting the drug ledger.  We overrule this
point of error. 

III.       CONCLUSION


            We affirm the judgment of the trial
court.

 

                                                                        Bailey
C. Moseley

                                                                        Justice

 

Date Submitted:          September 10, 2010

Date Decided:             September 14, 2010

 

Publish











[1]Tex. Health & Safety Code Ann. §
481.115 (Vernon 2010).

 





[2]Tex. Health & Safety Code Ann. §
481.112 (Vernon 2010).

 





[3]Head
did not testify on this issue.

 





[4]Ephedrine
is the primary ingredient in methamphetamine. 






[5]Miranda v. Arizona, 384 U.S. 436 (1966).

 





[6]At
trial, Woolverton denied having given Cline a statement to this effect.  No such written statement appears in the
record, and Woolverton maintained her innocence at trial.  





[7]U.S. Const. amend. IV.





[8]Woolverton
did not object to Clines testimony regarding the contents of the ledger, such
as the initials of each individual and the amount of methamphetamine they may
have purchased and the cost of various purchases. 





[9]Woolverton
did not request a limiting instruction regarding the drug ledger, limiting same
from proving anything other than the character and use of the place where it
was located.