**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 9, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MARCUS DURELL HOOKS and
ROBERT CHAVELLE FERRELL,

Defendant-Appellants.

Nos. 08-7021
and 08-7026

---

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. Nos. 6:07-CR-00032-RAW-1 & 2)**

---

*08-7026, US v. Ferrell, Submitted on Oral Argument and 08-7021, US v. Hooks, Submitted on the Briefs:*

Robert Ridenour, Assistant Federal Public Defender (Julia L. O'Connell, Federal Public Defender, and Barry L. Derryberry, Research and Writing Specialist, with him on the briefs), Office of the Federal Public Defender, Northern and Eastern Districts of Oklahoma, Tulsa, Oklahoma, for Defendant-Appellant Ferrell.

Roger Hilfiger, Muskogee, Oklahoma, on the briefs for Defendant-Appellant Hooks.

Rob Wallace, Assistant United States Attorney (Sheldon J. Sperling, United States Attorney, with him on the briefs), Muskogee, Oklahoma, for Plainitff-Appellee.

Before, **TACHA**, **HOLLOWAY**, and **SEYMOUR**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

On August 23, 2007, a jury convicted both Marcus Durrell Hooks and Robert Chavelle Ferrell of possessing a firearm after former felony conviction in violation of 18 U.S.C. § 922(g)(1) and (2). Mr. Hooks and Mr. Ferrell appeal their convictions. Defendants challenge the sufficiency of the evidence supporting their convictions as well as the adequacy of the jury instructions, the factual basis for the application of an enhancement statute, and the district court's failure to compel the testimony of a witness during sentencing. We affirm Mr. Hooks' conviction but reverse the conviction of Mr. Ferrell.

**I.**

**Background**

Around dusk on the evening of October 24, 2006, local law enforcement set up a safety checkpoint at the intersection of State Highway 9 and State Highway 52 in McIntosh County, in the Eastern District of Oklahoma. Soon thereafter a Dodge pickup truck with dark tinted windows slowly approached the checkpoint lane manned by Officer Burkley Cash. The pickup stopped after Officer Cash knocked on the driver's side window and asked the driver to roll down his window. Officer Cash peered into the vehicle and saw a driver, later determined

to be defendant Hooks, and a front seat passenger, later determined to be defendant Ferrell. Mr. Ferrell was turned towards the driver's side window, back against the passenger side door and "square with" Officer Cash.[1] Officer Cash scanned the interior of the pickup and saw what appeared to be a revolver with a wooden handle and black cylinder and hammer lodged in the seat next to the driver's right leg. In response, he reached for his weapon and yelled "gun." Rec., vol. IV at 38. The pickup rapidly sped away. Officer Cash pursued the vehicle in his patrol car, initiating his emergency lights, dash camcorder, and sirens. Two other patrol cars followed. Officer Cash testified that he did not see anything thrown from the pickup during the pursuit. However, another officer in one of the following patrol cars, Timothy Turner, testified that he saw a dark colored shirt floating in the air in front of his unit's hood on the passenger side.

The pursuit of the pickup lasted only about a mile. Once the vehicle stopped, the officers performed a felony stop. Mr. Hooks and Mr. Ferrell exited the driver's side of the vehicle; shortly thereafter, the officers discovered two

---

[1] The government asserted during oral argument that Officer Cash testified "Ferrell was turned with his back against the passenger door and *there was a jacket laying in his lap* . . . ." Audio Recording, Oral Argument at 14:54 (Nov. 20, 2008) (on file with Tenth Circuit) (emphasis added). The implication was that Mr. Ferrell could have been hiding a gun on his lap. To the contrary, Officer Cash did not testify about a jacket lying in Mr. Ferrell's lap. He made only one reference to a jacket. When asked whether Mr. Ferrell claimed ownership of any items in the pickup, Officer Cash testified "[h]e had a coat." Rec., vol. IV at 108. We admonish the government for making material factual assertions to the court not supported by the record.

additional passengers hiding in the backseat. Officer Cash placed Mr. Hooks and Mr. Ferrell in his patrol unit, which had interior and exterior audio recording devices. The officers then searched the pickup. The pickup had two doors, two front side windows, and two rear side windows. The record is unclear as to whether the rear passenger windows could be opened from the inside.[2] Officer Cash testified that he discovered a "large hole" in the passenger side rear window of the pickup. The officers also discovered marijuana crumbs in the vehicle. During the officers' search, the audio recorder on Officer Cash's patrol unit dash cam recorded conversation between Mr. Hooks and Mr. Ferrell. The dash cam did not record defendants' facial expressions or lip movement, however, because the dash cam was pointed toward the front windshield.

The officers failed to locate any firearms in the pickup. Accordingly, as he transported Mr. Hooks and Mr. Ferrell to the local jail, Officer Cash retraced a portion of the route he had taken in pursuit of the truck. Officer Cash found a black t-shirt he had not see before in the eastbound lane on the south side (or

---

[2] Upon being asked whether there were "any other windows that could be opened in th[e] pickup other than the side windows," Officer Cash responded that "[t]here was a hole on the passenger side rear window, on the window – the back window of the vehicle, there was a large hole actually coming out of it." Rec., vol. IV at 83. Officer Cash did not testify "to th[e] effect," as the government contends, that the back window could not be opened from the inside. Audio Recording, Oral Argument at 17:15. Further, no one testified that "[t]he hole was in the back window of the truck [on the passenger's side] . . . *behind* the back seat passengers," as the government asserted at oral argument. *Id.* at 22:21 (emphasis added).

"passenger side") of the road. The black t-shirt lay approximately three-quarters to half of a mile back from where the officers had first stopped the pickup. Officer Cash also found several brass nine millimeter bullets and a nine millimeter Uzi M-11 in a nearby adjacent ditch located ten to fifteen feet from the edge of the road. The Uzi did not match the weapon Officer Cash believed he saw in the pickup. Officer Turner asked Mr. Hooks about the whereabouts of the gun that Officer Cash had seen in the pickup. He testified that Mr. Hooks said he had no gun but only wooden handles (or grips) for a gun, which he had thrown out of the pickup during the chase.

Late the next day, Officer Cash and Officer Turner again searched the area along the route of the pursuit. Officer Cash found a .38 ROHM revolver with a plastic, wooden-looking grip that matched the pistol he believed he had seen in the pickup the day before. The .38 revolver lay fifteen to twenty feet off the road from where they had found the black t-shirt and approximately ten feet from where the Uzi was found. The government subsequently charged Mr. Hooks with possession of the .38 revolver, and Mr. Ferrell with possession of the Uzi-type, SWD Cobray M-11.

Before trial, the government sought to admit excerpts of the video from Officer Cash's dash cam with transcribed captions of the audio on the bottom of the screen. The audio included conversation that occurred between Mr. Hooks and Mr. Ferrell while seated in the patrol car. Both defendants filed motions to

exclude the video, with Mr. Hooks seeking to exclude any transcript of the audio recording as well as the video. Mr. Hooks claimed that the audio was not sufficiently audible, that the audio itself – not interpretations in transcripts – was the "best evidence" of the dialogue, and that the video would confuse or mislead the jury under Fed. R. Evid. 403. The district court denied defendants' motions. The court instructed counsel to attempt to stipulate to the contents of the transcripts to be admitted at trial. Counsel for the parties met and agreed on what the video clips said and transcripts were prepared in accordance with the parties' informal agreement.[3]

At trial, defendants renewed their objections to the admission of the transcripts, arguing that parts of the audio were inaudible and that the transcripts would be emphasized over that portion of the audio the jurors could actually hear and understand. They contended that "reasonable minds c[ould] differ about what[] [was] being said on the tape." Rec., vol. IV at 155. The district court overruled their objections. The court allowed the transcription of the audio to be displayed as captions on the video, but did not permit written transcripts to be

---

[3] During the pretrial hearing, defense counsel acknowledged,

> [Counsel for defendants] went over a week or two ago and spoke with [the prosecutor] and we went over the tape and we listened to it and we – though we object to the admission of the transcript and to the contents of it, we agreed that it sounded as if that's what it said on there. And no objection to that.

Rec., vol. IV at 153-54.

given to the jury. The district court reasoned that because the government's case rested almost entirely on the video clips, which admittedly were of poor quality, the jurors should deliberate based on what they actually heard – not on someone else's interpretation.

The jury watched four video clips displaying the captions. The following excerpted conversations occurred during and immediately after the officers searched the pickup while defendants were sitting in the patrol car:

> Hooks: Well he just pulled up, they must have found it
> Ferrell: Huh they found it
> . . . .
> Hooks: They must have found them straps [(*i.e.*, guns)[4]] and shit we fixin to be gone
> Ferrell: Hell no I ain't gone
> Hooks: I am gonna get hit with all that shit they find
> Ferrell: Hmm
> Hooks: They gonna hit me with all that shit that they find
> Ferrell: They still tryin to scrape up these [marijuana] crumbs [5] cuz. You see them scraping up those crumbs?
> Hooks: uh huh

Gov't Ex. 1, Tr. of Video Clip 1; *see also* Rec., vol. IV at 174-75.

> Ferrell: We took a fat loss Cuz.
> . . . .
> Hooks: A fat ass loss and the man coming with more money.
> Ferrell: And we fixin to lose more.
> Hooks: I pray to god they ain't gonna find that shit[.]

---

[4] An ATF agent testified that, based on his training and experience, the term "strap" means a pistol or firearm in street slang. The agent admitted, however, that the term could have other meanings in other contexts.

[5] The officers found marijuana crumbs in the passenger compartment of the pickup.

-7-

Gov't Ex. 2, Tr. of Video Clip 2. The government also introduced excerpts of

conversation that occurred after the discovery of the Uzi M-11 and during Officer

Cash's inspection of the firearm.

> Ferrell: Whose Uzi?
> Officer Cash: Huh?
> Ferrell: Did you say you found an Uzi?
> Officer Cash: Yeah, I found an Uzi. Probably ain't you all's, is it?
> Ferrell: Huh? Hell, no.
> Officer Cash: No, you all just carry marijuana and gun stocks, right?
> [(*vehicle door closes*)]
> Ferrell: As long as they don't find that revolver, cuz, you cool, cause
> he stated he thought it was a revolver (inaudible). We can beat that
> shit in court.
> Ferrell: Your fingerprints on all that?
> Hooks: I think I touched that home [sic].
> Ferrell: As long as he don't find that revolver.

Gov't Ex. 3, Tr. of Video Clip 3.

> Hooks: See if there's one in the chamber.
> Ferrell: He don't even know how rack it [(*i.e.*, the Uzi)], dumb
> bastard.
> Ferrell: One in the chamber.
> Hooks: They wasn't none in the chamber.
> Ferrell: Wasn't in the chamber?
> Hooks: huh uh
> Ferrell: They gonna have to clean it to get a fingerprint off of that
> cuz.

Gov't Ex. 4, Tr. of Video Clip 4.

Before closing arguments, the district court instructed the jury. The

instructions did not include a limiting instruction regarding the jury's possible

reliance on the transcribed captions over the actual audio. Neither the

government nor defendants requested such a limiting instruction. The jury

returned guilty verdicts against both defendants.

A probation officer prepared presentence reports ("PSR") for defendants prior to their respective sentencing. Neither Mr. Hooks nor Mr. Ferrell initially filed objections to their PSRs. The Government objected to both PSRs, however, claiming that the reports should have included enhancements for firearm possession in connection with another felony offense, *i.e.*, possession of controlled substances with intent to distribute, in accordance with U.S.S.G. § 2K2.1(b)(6). Both PSRs described "The Offense Conduct" as including "a yellow envelope containing a plastic bag that had numerous blue pills believed to be ecstasy," which was found near the Uzi M-11. Rec., vol. VI at 2; *accord* Rec., vol. VII at 2. The PSR noted that "104 of the tablets were found to be [a combination of] Methamphetamine and 3,4 Methylenedioxymethamphetamine (ecstacy)." Rec., vol. VI at 2; *accord*, Rec., vol. VII at 2. According to the government, it did not disclose or admit the contents of the envelope at trial because of this evidence's highly prejudicial nature and lack of relevancy to the crimes charged.

Defendants filed objections in response to the government's objections. Mr. Hooks pointed out that "there was no testimony at trial concerning the envelope and its contents." Rec., vol. VI at 11. According to Mr. Hooks, "any evidence of proximity to firearms was only as to the envelope being near the [Uzi] which was charged to Ferrell and not Hooks, and the Hooks firearm was

found at a later time and 15 feet or more from the envelope." *Id.* He further asserted "the government had an opportunity to charge this in an indictment . . . and the enhancement requested should not be allowed without the evidentiary standards afforded a defendant at trial." *Id.* The government did not proffer any additional evidence.

At the sentencing hearing, Mr. Ferrell sought to present testimony from one of the pickup's backseat passengers. He wanted to question this individual about his possession of the ecstacy found near the firearms, to which he had pled guilty in state court. Mr. Ferrell's counsel stated that he intended to ask the witness whether Mr. Ferrell could "have reached up there and grabbed that dope and took off with it, which evidences possession." Rec., vol. V at 18. Before Mr. Ferrell's counsel could make such an inquiry, the witness asserted his Fifth Amendment privilege against self-incrimination. Mr. Ferrell's counsel requested that the court compel the witness to testify, but the court declined, concluding that it would not compel testimony about a matter that could lead to federal prosecution of the witness.

Based on the record, the district court applied the § 2K2.1(b)(6) enhancement to Mr. Hooks and Mr. Ferrell. The court reasoned that

> [t]he availability of [Mr. Ferrell]'s gun in such close proximity to the drugs in this case is sufficient evidence of a connection between the firearm and the drugs to invoke the application of the four level enhancement. . . . [T]he Court finds by a preponderance of the evidence that [Mr. Hooks] should be held accountable for also

-10-

> possessing his firearm in connection with the possession of [ecstacy] with intent to distribute since all these items were thrown from the same vehicle during the police pursuit.

*Id.* at 21-22; *see also id.* at 31. The district court adopted the PSRs, with modified base offense levels, as the factual basis for defendants' sentences. Defendants objected to the court's sentencing determinations.

Defendants assert several grounds for appeal. They seek reversal of their convictions or, alternatively, remand for resentencing. Mr. Hooks argues that the district court erred in allowing the jury to view the video clips without giving a limiting instruction regarding the weight to be given to the transcribed captions. He contends the evidence is insufficient to support his conviction for felonious possession of the .38 revolver. He also asserts that the district court erred in applying the four-point enhancement to his sentence without factual support in the record.

Mr. Ferrell asserts two grounds for appeal. He argues that the evidence is insufficient to support his conviction for possessing the Uzi under the principles of constructive possession and joint occupancy. He also contends the district court abused its discretion by allowing a prospective sentencing witness to assert his Fifth Amendment privilege against self-incrimination, thereby denying Mr. Ferrell the opportunity to present evidence relevant to sentencing.

## II.

### Sufficiency of the Evidence

We review *de novo* challenges to the sufficiency of the evidence. *United States v. Higgins*, 282 F.3d 1261, 1274 (10th Cir. 2002). In ascertaining sufficiency, we view all of the evidence in the light most favorable to the government and ask whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Hamilton*, 413 F.3d 1138, 1143 (10th Cir. 2005). We reverse a conviction only if no reasonable jury could have reached the challenged verdict. *See United States v. Wilson*, 107 F.3d 774, 778 (10th Cir. 1997).

To prove constructive possession under 18 U.S.C. § 922(g)(1), the government must show, *inter alia*, that the defendant "knowingly [held] ownership, dominion, or control over the object and the premises where it is found." *United States v. Hishaw*, 235 F.3d 565, 571 (10th Cir. 2000) (alteration in original). Stated another way, the government must show that the defendant had knowledge of and access to the firearm. *Id.* In the case of joint occupancy of a structure or vehicle, as here, "evidence of knowledge and access may be proved by direct evidence, or inferred from circumstantial evidence, so long as the circumstantial evidence *includes something other than mere proximity . . . .*" *United States v. Jameson*, 478 F.3d 1204, 1209-10 (10th Cir. 2007) (emphasis added); *see also United States v. Hanrahan*, 508 F.3d 962, 969 (10th Cir. 2007)

-12-

("When two or more people occupy the space where the firearm is found, [] proximity to the firearm alone is insufficient to establish knowledge of and access to that firearm."). The government must demonstrate "some connection or nexus between the defendant and the firearm," *Hishaw*, 235 F.3d at 571, which leads to "at least a plausible inference that the defendant had knowledge of and access to the weapon or contraband[,]" *United States v. Michel*, 446 F.3d 1122, 1129 (10th Cir. 2006). In sum, a conviction may not rest upon the "piling of inference[] upon inference[]"; guilt must flow from "logical and probabilistic reasoning." *Id.* at 1128-29.

### A. Mr. Hooks' Conviction

Mr. Hooks contends a reasonable juror would have had a reasonable doubt as to whether the item seen by Officer Cash in the pickup was, in fact, the .38 revolver later discovered by Officer Cash. He notes that Officer Cash only momentarily saw what he claimed to be a revolver, at dusk in an unlighted pickup with dark tinted windows. Mr. Hooks points out that Officer Cash discovered the .38 revolver over eighteen hours later in an area the officers had extensively searched the night before and left unsecured in the interim. He further notes that no physical evidence, such as a fingerprint, links the revolver to him. According to Mr. Hooks, his conviction should therefore be reversed for insufficient evidence.

We disagree. A reasonable jury could have found Mr. Hooks guilty beyond

a reasonable doubt of possessing the .38 revolver. Several pieces of evidence lead us to this conclusion. First, Officer Cash testified that the .38 revolver was the firearm he saw wedged in the seat next to Mr. Hooks' right leg. Second, Mr. Hooks exhibited furtive behavior by fleeing the checkpoint and leading officers on a high-speed chase. Third, the discovery of the .38 revolver in the same area as the discarded t-shirt, when coupled with Mr. Hooks' post-arrest admission that he threw gun handles out of the pickup during the chase, is compelling evidence against Mr. Hooks. Fourth, Mr. Hooks' recorded statements to Mr. Ferrell affirmatively indicate his knowledge of the revolver. He remarked: (1) the officers "must have found them straps and shit we fixin to be gone," and (2) "I pray to god they ain't gonna find that shit." Mr. Hooks also made clear that he believed he, as the driver, would face criminal charges when he stated, "I am gonna get hit with all that shit they find." While we recognize that Officer Cash did not recover the .38 revolver until the day after the chase, Mr. Hooks' statements provide "some connection or nexus" between him and the firearm. *See Hishaw*, 235 F.3d at 571. The evidence logically and probabilistically shows that Mr. Hooks had knowledge of and access to the .38 revolver. *See Michel*, 446 F.3d at 1129. We therefore conclude that there is evidence sufficient to support Mr. Hooks' conviction.

### *B. Mr. Ferrell's Conviction*

Mr. Ferrell also contends the evidence is insufficient to support his

-14-

conviction, asserting that the government failed to establish a nexus between him and the Uzi.  According to Mr. Ferrell, the evidence in this case "contra-indicates guilt" and "amounts to mere presence in a car where a firearm was located." Aplt. Br. at 11, 14.

Having thoroughly reviewed the record, and mindful that there were two additional passengers in the back seat of the pickup, we agree that the record does not support Mr. Ferrell's conviction.  The government's evidence consists of no more than Mr. Ferrell's presence inside the pickup occupied by four persons, his recorded statements to Mr. Hooks, and the location where the Uzi was found by the side of the road.  Viewing the evidence in the light most favorable to the government, we hold that no reasonable jury could have found Mr. Ferrell guilty beyond a reasonable doubt.  Even if we assume that Mr. Ferrell's mere presence in the pickup establishes proximity, *see Jameson*, 478 F.3d at 1209-10, the government still has failed to show that Mr. Ferrell had knowledge of or dominion or control over the Uzi, as opposed to the two passengers in the back of the pickup.

We emphasize dominion or control, as opposed to "access to," because of our decision in *United States v. Norman*, 388 F.3d 1337 (10th Cir. 2004).  In *Norman*, we noted that a firearm does not need to be "readily accessible," *i.e.*, "visible and retrievable," to a defendant at the time of his arrest for the defendant to constructively possess it.  *Id.* at 1341-42.  The firearm may be locked in a

-15-

glove compartment or even stored in the trunk of a car, assuming the defendant had knowledge and control of it. *See id.* at 1342. In other words, a defendant's "access to" a firearm is not determined by his proximity to the firearm. Rather, the "access to" element necessarily subsumes a subelement of "ownership, dominion, or control." *Cf. United States v. Behanna*, 814 F.2d 1318, 1320 (9th Cir. 1987) ("When the government charges an individual with possession of a weapon in a vehicle, we have squarely held that the government must do more than show that the defendant was present as a passenger in the vehicle and within reach of the weapon."); *United States v. Whitfield*, 629 F.2d 136, 143 (D.C. Cir. 1980) (concluding that evidence of mere accessibility, without evidence of dominion and control, is insufficient to support a finding of constructive possession).

Regarding Mr. Ferrell's recorded statements, we conclude his comments to Mr. Hooks do not evince knowledge of the *Uzi's presence in the vehicle*. Mr. Ferrell denied ownership of the Uzi upon inquiry by Officer Cash. He also asked Mr. Hooks whether Mr. Hooks' fingerprints were "on all that," referring to the Uzi the officer was holding outside the patrol car. Gov't Ex. 3, Tr. of Video Clip 3. Mr. Hooks replied "I think I touched that home [sic]." *Id.* Mr. Hooks – not Mr. Ferrell – commented that he thought the Uzi had no bullets in the chamber. *See* Gov't Ex. 4, Tr. of Video Clip 4. Mr. Ferrell's observation that the officer did not know how to rack the Uzi is not evidence of knowledge of the weapon

-16-

while it was in the vehicle. While the remark may indicate general knowledge of how to operate a semiautomatic firearm, it does not establish that Mr. Ferrell knew that the Uzi was in the pickup.

Similarly, the area in which the Uzi was found does not show Mr. Ferrell's dominion or control over the firearm. Officer Cash discovered the Uzi in a ditch on what was the passenger's side of the highway, three-quarters to half of a mile back from where the pickup had been stopped. The Uzi had no fingerprints on it, and the record contains no officer testimony, physics analysis, or other evidence identifying the window from which the firearm was thrown. The record merely reveals that at least the front windows could be opened from the inside, and that the passenger window in the rear where two other passengers were located had a large hole in it. The officers admit, moreover, that they did not observe the Uzi in the pickup or being thrown from the vehicle.

At bottom, we can readily distinguish the dearth of circumstantial evidence in this case from the relative abundance of such evidence in our prior decisions upholding possession convictions. *See*, *e.g.*, *Jameson*, 478 F.3d at 1210 (upholding possession conviction where government's evidence included defendant's "furtive movements, his inferred physical contact with the pistol (his foot was on top of it), and the pistol's being in plain view and easily retrievable to a passenger in [the defendant]'s seat") (internal citation omitted); *Michel*, 446 F.3d at 1128-29 (upholding possession conviction where defendant, the front-seat

passenger in the car in which the gun was found, made repeated movements toward the back seat area where the gun was located); *Norman*, 388 F.3d at 1341 (finding sufficient evidence of knowing possession where defendant, the owner and driver of the vehicle, exhibited anxious and bizarre behavior throughout his encounter with the police, had a key to the locked glove compartment in which the gun was found, may have had exclusive possession of the vehicle the evening before his arrest, and transported a passenger whose behavior and statements indicated no knowledge of the firearm); *United States v. Gorman*, 312 F.3d 1159, 1164 (10th Cir. 2002) (holding the evidence established sufficient nexus between defendant and the firearm where defendant owned and worked on the vehicle in which the firearm was found, and the firearm was partially hidden on defendant's side of the vehicle and retrievable from defendant's driver-side seat); *United States v. Springfield*, 196 F.3d 1180, 1184 (10th Cir. 1999) (upholding possession conviction where defendant (i) engaged in furtive movements while being followed by the police, (ii) had been seated in the rear of the van where the gun was found, and (iii) carried on his person bullets linking him to the gun). Here, the government's only real link to Mr. Ferrell is his "prese[nce] inside a car with three others where a [different] gun was [arguably thrown out]." *Jameson*, 478 F.3d at 1210. The evidence here, without more, does not support a finding of guilt beyond a reasonable doubt.

We conclude that Mr. Ferrell's conviction is not supported by the evidence

and must be reversed. In light of this conclusion, we need not address his other grounds for reversal of his conviction or sentence.

## III.

## Jury Instructions

Mr. Hooks argues that he was prejudiced by the district court's failure to give a limiting instruction regarding reliance on the video clips' transcribed captions. According to Mr. Hooks, the jurors might have relied on the written statements more than what they individually heard and understood. He contends the district court's instructions did not properly guide the jury because the instructions failed to advise on this crucial aspect of the government's case.

We review jury instructions *de novo*, in the context of the entire trial and as a whole, "to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues." *United States v. Bedford*, 536 F.3d 1148, 1152 (10th Cir. 2008) (internal quotation marks omitted). We review for abuse of discretion a district court's decision to give or to decline a particular requested instruction. *Id.* We reverse a conviction "if we have substantial doubt that the jury was fairly guided." *United States v. LaVallee*, 439 F.3d 670, 684 (10th Cir. 2006) (internal quotation marks omitted). However, "[u]nopposed instructions are reviewed only for plain error." *United States v. Nacchio*, 519 F.3d 1140, 1159 (10th Cir. 2008), *reh'g granted*, 535 F.3d 1165 (10th Cir. 2008).

-19-

We note at the outset that Mr. Hooks stipulated to the accuracy of the admitted transcripts before trial and did not seek to proffer his own version of them. Because Mr. Hooks did not request a "best evidence" limiting instruction or otherwise object to the instructions, we review the district court's instructions for plain error. "Plain error exists only where (1) there was error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings." *Bedford*, 536 F.3d at 1153. In other words, the defendant "must establish not only the existence of an error that is clear or obvious under current law, but also that such error affects his substantial rights and seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Schene*, 543 F.3d 627, 638 (10th Cir. 2008).

Mr. Hooks first must show plain error. Tenth Circuit law is well-settled that a district court has discretion in admitting the transcription of an audio recording. *United States v. Davis*, 929 F.2d 554, 559 (10th Cir. 1991); *United States v. Devous*, 764 F.2d 1349, 1353 (10th Cir. 1985). In the absence of a stipulation by the parties, the court should determine the accuracy of transcripts. *See Devous*, 764 F.2d at 1355. If transcripts are admitted and discrepancies or errors exist, the court may give a "cautionary instruction to the jury, telling [it] that the tapes [a]re the true evidence and that the transcripts [a]re to be used only for clarification." *Davis*, 929 F.2d at 559; *see also United States v. Lucero*, 601

-20-

F.2d 1147, 1149 (10th Cir.1979) (noting district court gave "vigorous cautionary instructions" in response to defendant's challenge to the accuracy of the transcripts).  While limiting instructions are advisable, we have never held that a district court must give such an instruction in every case in which transcripts of audio recordings are admitted.

We are not convinced that Mr. Hooks has shown plain error.  No prejudicial danger could possibly arise from the absence of a limiting instruction if Mr. Hooks agreed that no discrepancies or errors existed between the actual audio and the transcribed captions.  The jury could safely rely on the captions, for the captions were no more than a typewritten facsimile of the audio itself.  Mr. Hooks cannot claim error simply because the jury could see, as well as hear, his undisputed statements.  Because Mr. Hooks' stipulation to the accuracy of the transcripts offset the need for a cautionary instruction, *see Devous*, 764 F.2d at 1355, his argument necessarily fails.

## IV.

### Application of the Enhancement Statute

Mr. Hooks argues that the district court erred by applying the U.S.S.G. § 2K2.1(b)(6) sentencing enhancement when nothing in the record showed he possessed the .38 revolver in connection with another felony offense.  Mr. Hooks points out that the district court based its finding on facts – *i.e.*, the yellow envelope containing ecstacy pills found near the Uzi – set forth in the PSR but not

presented at the suppression hearing or at trial. According to Mr. Hooks, the record does not include unproven facts merely mentioned in a PSR and does not support an inference that he possessed the .38 revolver in connection with a drug offense.

The government, by contrast, contends that the record does support the district court's factual finding regarding the four-point enhancement. It asserts that Mr. Hooks' recorded statements about accountability for "all that shit they find" and the impending "fat ass loss" clearly references "the economic loss" Mr. Hooks faced as a result of the hasty disposal of the "illegal product along the side of the road." Aple. Br. at 12. The government also points out that Mr. Hooks did not object to the accuracy or inclusion of the facts in the PSR, which the district court adopted as the basis for the enhancement. Thus, according to the government, the district court did not err in relying on this information.

We review the factual findings underlying a district court's sentencing determination for clear error and review the underlying legal conclusions *de novo*. *United States v. Swanson*, 253 F.3d 1220, 1222 (10th Cir. 2001). We give "due deference to the district court's application of the [Sentencing] Guidelines to the facts." *United States v. Sells*, 541 F.3d 1227, 1235 (10th Cir. 2008). Factual findings must be supported by a preponderance of the evidence. *United States v. Munoz-Tello*, 531 F.3d 1174, 1181 n.12 (10th Cir. 2008). Clear error exists if a factual finding "is wholly without factual support in the record, or after reviewing

-22-

the evidence, we are definitively and firmly convinced that a mistake has been made." *United States v. Ivory*, 532 F.3d 1095, 1103 (10th Cir. 2008); *see United States v. Cardenas-Alatorre*, 485 F.3d 1111, 1119 (10th Cir. 2007) ("[A] finding must be more than possibly or even probably wrong; the error must be pellucid to any objective observer.").

We are not persuaded by Mr. Hooks' argument that there was sentencing error. "With few limitations, a court has almost unlimited discretion in determining what information it will hear and rely upon in imposing [a] sentence" under the advisory sentencing guidelines. *United States v. Graves*, 785 F.2d 870, 872 (10th Cir. 1986); *see United States v. Todd*, 515 F.3d 1128, 1137 (10th Cir. 2008) ("18 U.S.C. § 3661 specifies that no limitation should be placed on the information concerning the background, character, and conduct of a defendant that a district court may consider in sentencing . . . ." (internal quotation marks omitted)). A district court "may accept any undisputed portion of the presentence report as a finding of fact." Fed. R. Crim. P. 32(i)(3)(A). While we have noted that "[a] district court may not simply adopt the PSR as its findings when the defendant disputes the report[,]" *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1131 (10th Cir. 2006), we have never held that a factually *undisputed* PSR can not form the basis for factual findings. We see no reason why the record should not include "the uncontroverted facts in [a] Presentence Report." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1056 (10th Cir. 1994). If a defendant fails to

specifically object to a fact in the PSR, the fact is deemed admitted by the defendant and the government need not produce additional evidence in support of the admitted fact. *United States v. White*, 447 F.3d 1029, 1032 (8th Cir. 2006).

Here, Mr. Hooks did not object to the accuracy or inclusion of the facts in the PSR. He never contended the envelope contained something other than ecstacy, and he never proffered mitigating exculpatory evidence. Mr. Hooks instead contended that the requested enhancement required proof beyond a reasonable doubt that he possessed the firearm in connection with controlled dangerous substances. However, an objection based on the purported failure to satisfy a specified standard of proof is wholly distinguishable from an objection based on the alleged factual inaccuracy of a PSR. As long as Mr. Hooks did not contest the truthfulness of the PSR's description of the envelope's contents, the PSR remained undisputed and thus satisfied the preponderance of the evidence standard with respect to the existence of the drugs.

The record also support's the district court's finding that Mr. Hooks possessed the .38 revolver in connection with the felony possession of drugs for sale. Mr. Hooks' recorded conversation about his potential legal and financial accountability for the drugs as well as the revolver the officers might find provides sufficient factual support for the four-point enhancement. We therefore conclude that the district court did not err.

For the foregoing reasons, we **REVERSE** Mr. Ferrell's conviction, and

-24-

**AFFIRM** Mr. Hooks' conviction and sentencing.