FILED
United States Court of Appeals
Tenth Circuit

August 21, 2012

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENCH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SAUL GALVAN-ESTRADA, also
known as ROLANDO GALVAN,

Defendant - Appellant.

No. 11-3318

(D. of Kan.)

(D.C. No. 6:10-CR-10127-JTM-4)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **TYMKOVICH**, and **GORSUCH**, Circuit Judges.[**]

Saul Galvan-Estrada was convicted in federal court in Kansas of two
charges arising out of a scheme to distribute methamphetamine. The first count
alleged the use of a cell phone to facilitate the distribution of methamphetamine,
21 U.S.C. § 843(b), and the second count the actual distribution of 156 grams of
methamphetamine, 21 U.S.C. § 843(a)(1).

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

[**] After examining the briefs and the appellate record, this three-judge
panel has determined unanimously that oral argument would not be of material
assistance in the determination of this appeal. *See* Fed. R. App. P. 34(a); 10th
Cir. R. 34.1(G). The cause is therefore ordered submitted without oral argument.

He now appeals, challenging the sufficiency of the evidence supporting his conviction.  We AFFIRM.

**I.**

Wichita police developed information about drug trafficking by a man named Juvenal Saenz-Ramirez.  As part of an investigation into this drug dealing, the police wire-tapped his phone and the phone of Galvan-Estrada's employer and former co-defendant Lorenzo Olivas-Cervantes.  The police believed that Olivas-Cervantes was supplying drugs to Saenz-Ramirez.

The basis for the first count (involving use of a communication facility to facilitate drug distribution, 21 U.S.C. § 843(b)) arises from a call between Galvan-Estrada and Olivas-Cervantes that police intercepted on October 1, 2008.  At the time, Galvan-Estrada was employed by Olivas-Cervantes to care for his horses (and the police had intercepted numerous calls between the two of them relating to this horse care work), but this was the first taped conversation that appeared to police to be a coded drug transaction.

After they spoke about some other matters, Galvan-Estrada asked Olivas-Cervantes, in Spanish, how much his customer wanted for the "work."  Supp. R. 6.  Olivas-Cervantes replied "twenty-two bucks."  *Id*.  The two men discussed their concerns about the price, and Galvan-Estrada said "Yeah, but he said he would get rid of them quickly, fool."  *Id.*  At a later point in the conversation Olivas-Cervantes commented, "He himself says the other stuff that other guy

-2-

brings is f***ing crap." Supp. R. 7. Galvan-Estrada replied, "Yes, but he says the guys was bringing good one, but he says that . . . he was bringing good ones and then he would screw him with s***." *Id.* The police expert testified that this is the type of language drug dealers usually use to speak about their transactions.

The basis for the second count (actual drug distribution, 21 U.S.C. § 843(a)(1)) is a transaction that happened three days after this phone call. The police were able to observe this transaction because the day before, October 6, they intercepted a call they believed to be a discussion between Saenz-Ramirez and Olivas-Cervantes, arranging for a substantial drug transaction the following day. The police arranged for surveillance on Olivas-Cervantes's home.

The next morning Olivas-Cervantes and the defendant, Galvan-Estrada, went to breakfast together, tailed by the police. During the drive to the restaurant, Olivas-Cervantes, Saenz-Ramirez, and two other drug dealers spoke on the phone, continuing their coded discussion of the upcoming drug deal and arranging a meeting place and time—all caught on tape by the police. It is undisputed that Galvan-Estrada heard these conversations.

After leaving the restaurant, Galvan-Estrada and Olivas-Cervantes drove into the parking lot of another restaurant. Olivas-Cervantes went inside while Galvan-Estrada remained in his truck. At that point, another suspect, Miguel Ramirez, walked up to the truck and "either said or handed something to the defendant." R. 97. Later, after Olivas-Cervantes returned and as they were about

to leave, Galvan-Estrada darted out of the truck and "stuck something in the—the driver's side of [Ramirez's car], like he handed Ramirez something." R. 97 This pass was caught on video.

The surveillance team contacted uniformed troopers in a patrol car, who then stopped Ramirez for a traffic violation. Their drug dog circled Ramirez's car, and alerted on the driver's side. A search revealed a Wal-Mart bag with a smaller bag of methamphetamine inside. Galvan-Estrada and the others were arrested and charged with drug distribution.

The day before trial, Olivas-Cervantes pleaded guilty and agreed to testify against his co-defendants in exchange for a reduction in sentence. At the beginning of this testimony the jury learned that Olivas-Cervantes had received a reduction in sentence in exchange for his testimony, had served four years in prison for a prior drug offense, and had illegally reentered the United States after being deported for that drug offense.

The prosecution asked Olivas-Cervantes about the tape of his conversation with Galvan-Estrada. Olivas-Cervantes testified that the word "work" meant "drugs" and that "twenty-two bucks" meant "$22,000." R. 184. He also testified that he had discussed drug purchases with Galvan-Estrada on other occasions and that all the phones conversations presented to the jury in this case related to the methamphetamine sale in the restaurant parking lot.

-4-

Olivas-Cervantes also testified that on October 7—although Galvan-Estrada had originally come with him just for breakfast—he told Galvan-Estrada about the drug sale while they were driving. He was nervous that the police were investigating, so when they arrived at the restaurant where the deal would take place, Olivas-Cervantes "went into the restaurant and Galvan-Estrada took care of handing over the methamphetamine." R. 205. Galvan-Estrada knew the bag had drugs in it when he handed it off. (Olivas-Cervantes admitted this testimony contradicted what he had earlier told the police before he decided to cooperate.

At the close of the evidence, Galvan-Estrada moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 on the grounds that the government had not produced sufficient evidence to prove the two counts. After this motion was denied, he renewed it and also moved for a new trial under Federal Rule of Criminal Procedure 33 Both motions were also denied, and those denials are before us on appeal.

**II.**

"We review the sufficiency of the evidence to support a jury verdict *de novo* and examine only whether taking the evidence, both direct and circumstantial, in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Phillips*, 583 F.3d 1261, 1264 (10th Cir. 2009) (internal quotation marks omitted). "We reverse a conviction only if no reasonable jury could have reached the

challenged verdict." *United States v. Hooks*, 551 F.3d 1205, 1212 (10th Cir. 2009). "In reviewing the evidence in this light, we do not inquire into the jury's credibility determinations or its conclusions regarding the weight of the evidence." *United States v. Kaufman*, 546 F.3d 1242, 1263 (10th Cir. 2008).

Galvan-Estrada does not meet this high bar. As recounted above, the government presented sufficient evidence that a reasonable jury could have found Galvan-Estrada guilty of the two counts. Among other things, the evidence showed: (1) details of an ongoing police investigation into Galvan-Estrada's employer and alleged fellow methamphetamine distributor; (2) tapes and translated transcripts of a phone conversation between Galvan-Estrada and another man that police drug investigators reasonably believed concerned a drug transaction; (3) police witnesses who observed the alleged dealers meeting at the time and place they had arranged over the phone; (4) a witness who saw, and video-taped, Galvan-Estrada handing something to one of the alleged dealers; (5) a bag of methamphetamine; and (6) the testimony of Galvan-Estrada's employer and co-defendant explaining Galvan-Estrada's role in this drug transaction.

It is true, as Galvan-Estrada argues, that the jury was required to draw inferences and to rely on expert testimony to find him guilty of the first count of using a cell phone to facilitate the distribution of a controlled substance. And it is also true that the jury needed to draw some inferences from what the police saw in the parking lot and recorded on their wiretaps or to credit Olivas-Cervantes's

-6-

testimony to find Galvan-Estrada guilty of the second count of distribution of mephamphetamine.

But it is not our task to "inquire into the jury's credibility determinations or its conclusions regarding the weight of the evidence." *Kaufman*, 546 F.3d at 1263. A reasonable jury could have looked at the evidence provided, credited the testimony of the government's witnesses, and concluded beyond a reasonable doubt that Galvan-Estrada was guilty.

## III.

For the reasons stated above, Galvan-Estrada's convictions are AFFIRMED.

ENTERED FOR THE COURT

Timothy M. Tymkovich
Circuit Judge