# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 19, 2014 Session

## STATE OF TENNESSEE v. GREGORY DUFF

**Appeal from the Criminal Court for Knox County**
No. 95311     Steven Wayne Sword, Judge

No. E2013-01582-CCA-R3-CD - **Filed November 24, 2014**

A Knox County Criminal Court jury found the Defendant, Gregory Duff, guilty of two counts of aggravated kidnapping, Class B felonies. See T.C.A. § 39-13-304. The trial court merged the two counts and sentenced him as a Range II, multiple offender to nineteen years' imprisonment at 100 percent release eligibility. In this appeal, the Defendant argues that the evidence was insufficient to support his conviction and that the trial court erred in admitting 911 recordings into evidence.[1] Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., and DAVID A. PATTERSON, SP. J., joined.

Robert L. Vogel (on appeal) and Leslie M. Jeffress (at trial), Knoxville, Tennessee, for the Defendant-Appellant, Gregory Duff.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall E. Nichols, District Attorney General; Philip H. Morton and Takisha M. Fitzgerald, Assistant District Attorneys General, for the Appellee, State of Tennessee.

---

[1] We have re-numbered the Defendant's issues for clarity.

## OPINION

On August 10, 2010, the Knox County Grand Jury indicted the Defendant, Gregory Duff, for two alternative counts of aggravated kidnapping of the victim, Rondriea Barnett.[2] The following proof was presented at trial.

**State's Proof.** Michael Allen Mays testified as the keeper of the records for the Knox County 911 Office. He authenticated a disk of audio recordings of four emergency calls made in this case on July 13, 2010. Based on the computer aided dispatch, or CAD report, Mr. Mays said that the initial 911 call was received at 1:15 a.m., the police were dispatched at 1:20, and the first officer arrived at the scene at 1:32 a.m.

The recordings of the 911 calls were played for the jury. In the first call at 1:15 a.m., Whitney Karnes[3] reported that "someone just got kidnapped at Cassell Ridge Apartments." She told the dispatcher that a black male was beating a black female and then he placed her in a white truck and drove out of the apartment complex. She reported that the victim attempted to get out of the truck, but the suspect "was holding her in" and "wouldn't let her out." The caller stated, "Somebody needs to hurry before she ends up killed." The phone call lasted a little over three minutes.

In the second 911 recording, which was also placed at 1:15 a.m., a woman named Teresa Wyatt reported that she lived at Cassell Ridge Apartments and that a girl was kidnapped right out of the parking lot. She told the dispatcher that the suspect "was dragging [the victim] down the parking lot in the passenger side" and that they left in a white pickup truck that had its lights off. The caller reported that her son was pursuing the vehicle on foot and that as the vehicle was leaving, it struck another car. She did not know which direction the truck went.

In the third recording, a man called at 1:16 a.m. to report "a possible abduction from Cassell Ridge Apartments." The call lasted 22 seconds and the man ended the call when he realized that another caller had already reached 911.

---

[2] Specifically, Count 1 of the indictment alleged that in July 2010, the Defendant knowingly removed the victim so as to interfere substantially with her liberty and that the victim suffered bodily injury. Count 2 alleged that the Defendant knowingly confined the victim so as to interfere substantially with her liberty and that she suffered bodily injury.

[3] We glean the caller's name from the recording and the CAD report.

The fourth call was placed at 1:18 a.m. The male caller reported that he had chased a white '92 to '96 Ford Ranger on foot as it left the apartments.[4] He said that he had attempted to help the girl and that he was almost run over by the truck. The caller told the dispatcher that the suspect prevented the victim from escaping each time she tried to flee. He reported that at one point, "[the victim] was trying to get out into the parking lot when we pulled in and he actually slammed her in . . . slammed her and the door of the vehicle into a parked vehicle . . ." In the recording, the caller was panting as though he was out of breath. The dispatcher advised the caller that several people had called 911 and that officers would arrive at the scene shortly.

Dawn Clark, a resident of Cassell Ridge Apartments at the time of the incident, testified that the Defendant was the father of the victim's child. She said that at around 1:00 a.m. on July 13, 2010, she was talking with the victim and three other women in front of her apartment building. The Defendant then arrived in a white truck and the victim immediately "took off running up the steps" and entered an apartment. When she returned and walked up to the Defendant, he grabbed her by the hair, threw her on the ground, and began to beat her. Ms. Clark also saw the Defendant drag the victim on the sidewalk and kick her while she was on the ground. She stated that everyone was yelling and that as the Defendant hit the victim, he said, "You got these b***hes in my business." Ms. Clark then observed the following:

> And he snatched her up and threw her in the car, and she tried to get out of the car once. He--he threw her in the car, and he walked around to the other side, and she tried to get out of the car. He got out and went back around the car and hit her a few more times, closed the door. He didn't get to get all the way back around to the other side of the car before she opened the door again, and he went around there and hit her again--he hit her again. And after he hit her he--again, he kind of mushed her down and climbed over--climbed in the car on--on the passenger side.

Ms. Clark testified that she tried to write down the truck's license plate number but that she had to jump out of the way when the Defendant accelerated the vehicle in reverse. She then chased after the truck on foot. As the Defendant drove off, the victim opened the passenger door again, and the Defendant "swerved and hit a parked car to get the door to close." After the passenger door closed, the Defendant drove straight and sped out of the parking lot. Ms.

---

[4] The male caller also reported that his mother was Teresa Wyatt, the woman in the second 911 recording. Although not specified during testimony, it appears from the record and the State's closing argument that the caller is Joseph K. Collins, a witness for the State. In his brief, the Defendant acknowledged that the second caller, Teresa Wyatt, is the mother of Mr. Collins.

Clark stated that another car pulled into the lot as the Defendant drove off, and the man got out of his car and ran after the truck with her. However, once they got to the top of a hill, they lost sight of the truck and did not know the direction in which it drove.

Ms. Clark said that she and the man walked back to the apartment complex, and after the police had arrived, the victim returned in a different truck. She did not see who was driving the truck, which left after dropping off the victim. Ms. Clark stated that the victim was upset and crying, her face was bloody, her side and arm were "all scratched up," and her shirt was torn. Ms. Clark said that an ambulance arrived at the scene, though the victim did not want to go to the hospital. Two photographs of the victim and her injuries were admitted into evidence without objection.

On cross-examination, Ms. Clark testified that the victim was using her cell phone while they were outside, but she did not know with whom the victim was speaking. She said that neither the victim nor the Defendant said anything when the victim walked up to him. According to Ms. Clark, the victim did not say anything or make a sound until she was thrown into the truck. Ms. Clark acknowledged that she did not know what the victim was thinking that night.

Joseph K. Collins testified that at the time of the incident, he lived in Texas and that he was visiting his mother and sister at Cassell Ridge Apartments. They returned to the apartment complex at around 1:00 a.m. on July 13, 2010, when Mr. Collins noticed a commotion outside of one of the buildings. He said that there was an argument near a white truck and that the truck's headlights were off. He continued to watch the scene and observed the following:

> A little more screaming, yelling. The door slams. He starts to take off. That's when I started to realize something was going on, because the truck abruptly stopped again. The door--the passenger door came back open. I saw what I assumed to be a female out of the side of the vehicle, and then abruptly she went back in the side of the vehicle. The door slams. They're probably about a building and a half away from me now.
>
> The door comes back open. It abruptly goes to the right. I thought that it had hit a vehicle. I'm not sure if that was ever proven or not, but I--to my knowledge, I thought it struck a vehicle which slammed the door shut again.

Mr. Collins could hear the victim scream and cry as the truck approached him. He stood in front of the vehicle and waved a flashlight, but it did not stop or slow down, so he had to jump out of the way. Mr. Collins then called 911 as the truck drove past him. He ran after

the truck, but could not keep up, and he lost sight of the vehicle after it left the property. He testified that as the truck was about to exit the apartment complex, the door opened again and the victim was almost out of the vehicle, but someone slammed the brakes and "physically pulled her back in[.]" At that point, Mr. Collins could hear the victim scream, "Let me go." He knew that something was wrong when the victim was trying to get out of the truck. Mr. Collins recalled that in total, the passenger door opened "about five times" as the vehicle was moving. The only lights he ever saw on the truck were its brake lights. Mr. Collins was at the scene when the victim later returned in a dark SUV. He testified that the victim was missing a shoe and that her feet were "scuffed up . . . like a road rash."

On cross-examination, Mr. Collins stated that he did not see anyone run around the truck to shut the passenger door. He said that he reached the top of the second hill, past the first large speed bump, before he lost sight of the vehicle. He conceded that he did not know the Defendant or the victim or what was in their minds at the time.

Lieutenant Steven Patrick testified as the keeper of the records for jail phone calls at the Knox County Sheriff's Office. Over defense objection, two redacted recordings of jail phone calls were played for the jury. In the first call from September 2, 2010, the Defendant told the person on the line that if he called the victim, then she would not be home to be subpoenaed. In the second call from November 10, 2010, the Defendant opined that if the victim did not testify at trial, then there would be no case against him.

**Defense's Proof.** The Defendant elected not testify at trial. Rondriea Barnett, the named victim in the indictment, testified that she was twenty-one years old and that she met the Defendant when she was eighteen. She said that they had dated for about a year and had a child together but that they were no longer in a relationship. The victim stated that she was not kidnapped by the Defendant on July 13, 2010. She described the incident as follows:

> Me and Greg had got into it over the phone. He had came out there. We was arguing. Then he was, like, "Come on because people in our business." We had left. We had went to his mama house. We had a fight. After that, I got tired of hearing about it, so I left, and somebody dropped me off at home.

The victim acknowledged that the Defendant pulled her hair and hit her but denied that he kicked her or forced her to the ground. She said that she had hit the Defendant first and that she wanted to leave with him in his truck. She denied that the Defendant dragged her or threw her in the truck.

The victim explained that she had a scar on her forehead because she hit her face with the truck door that night. She stated that she injured her shoulder when she "tripped and fell"

while getting into the vehicle. The victim said she had opened the passenger door "[b]ecause it wouldn't close all the way" and denied that she had tried to escape from the truck. She stated that this was "the only time" the door was opened that night. She did not recall that the Defendant hit another car while driving. She denied ever saying, "Let me go."

When the victim returned to Cassell Ridge Apartments, she was surprised to see the police there. She told the police that she did not want to seek an order of protection or file any charges against the Defendant. She also said that she did not want an ambulance and that she just wanted to go home. She then spent the night with the Defendant. The victim denied that the Defendant or his family had attempted to prevent her from testifying. She said that she was not afraid of the Defendant and that they had a good relationship despite their arguments. She stated that this incident was "most likely" the only time that their arguments had been physical.

On cross-examination, the victim acknowledged that the Defendant hit her in May 2009, but she denied that he had hit her in the face with a closed fist. She agreed that after she returned to the apartments on July 13, 2010, she told an officer, "He had drove off, put me in the car, and had drove off and had bit me on my face." She conceded that she told the officer, "I had to jump out."

Based on the above proof, the jury convicted the Defendant as charged of two counts of aggravated kidnapping. The trial court subsequently merged the two alternative counts and sentenced the Defendant as a Range II, multiple offender to nineteen years' imprisonment, to be served at 100 percent. After the denial of his motion for new trial, the Defendant timely filed a notice of appeal.

## ANALYSIS

**I. Sufficiency of the Evidence.** On appeal, the Defendant argues that the evidence was insufficient to sustain his aggravated kidnapping convictions. He concedes that the victim suffered bodily injury but asserts that her testimony did not support a finding of unlawful removal or confinement. He maintains that his conviction should be set aside because "the victim stated categorically that she went willingly, was not held against her will, and returned on her own." The State responds that the evidence was sufficient for the jury to find the Defendant guilty beyond a reasonable doubt of both counts of aggravated kidnapping. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). This court

has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

To sustain a conviction for aggravated kidnapping, the State had to prove beyond a reasonable doubt that the Defendant knowingly and unlawfully removed or confined the victim so as to interfere substantially with her liberty and that the victim suffered bodily injury. See T.C.A. §§ 39-13-302(a), -304(a)(4) (2010). In challenging his conviction, the Defendant contends that while the victim "no doubt suffered serious injuries[,]" her testimony did not support a finding of false imprisonment. We conclude that there was sufficient evidence to support the jury's verdict.

Viewed in the light most favorable to the State, the proof established that the victim was outside with a group of women at Cassell Ridge Apartments when the Defendant drove up in a white truck. Dawn Clark testified that the victim promptly ran into an apartment when she saw the Defendant. After the victim later returned and approached the Defendant, he grabbed the victim by the hair, threw her to the ground, and began to assault her. Ms. Clark then observed the Defendant drag the victim toward the truck and throw her into the vehicle. She said that the victim opened the passenger door twice to flee, but that the Defendant beat the victim and ultimately climbed over her on the passenger side. Ms. Clark attempted to record the license plate number, but the Defendant accelerated the truck in reverse and nearly ran over Ms. Clark. Bystander Joseph K. Collins tried to stop the truck by waving a flashlight, but the Defendant sped toward him, and he had to jump out of the way. Ms. Clark and Mr. Collins both testified that they saw the passenger door open while the truck was moving, but that the Defendant swerved and hit a parked car, causing the door to slam shut and restrain the victim. Mr. Collins observed the truck door open "about five times" while it was moving, and he could hear the victim scream and cry. At one point, Mr. Collins saw the victim nearly exit the vehicle, but she was "physically pulled" back in. He also heard the victim scream, "Let me go."

Although the victim testified at trial that she willingly left with the Defendant on the evening in question, she acknowledged telling law enforcement that the Defendant placed her in the vehicle and drove off and that she "had to jump out." This statement was consistent with Mr. Collins's observation that the victim was missing a shoe and had "road rash" on her feet after she returned to the apartments. Even though Ms. Clark and Mr. Collins could not speculate regarding what was in the minds of the Defendant and the victim, a rational trier of fact could conclude that the Defendant forcibly removed and confined the victim based on the eyewitness testimony. Moreover, the jury could reasonably infer that the Defendant substantially interfered with the victim's liberty. As the Defendant drove off with the victim, he prevented her escape and prevented others from assisting her. Here, two witnesses testified that the victim screamed and cried and repeatedly opened the truck door in an effort to leave. Although the victim provided alternative explanations for her injuries and for the opening of the truck door, the jury was entitled to reject her testimony. See State v. Evans, 108 S.W.3d 231, 236-27 (Tenn. 2003) (citing State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000)). We conclude that the proof was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the Defendant committed aggravated kidnapping based on either unlawful removal or confinement of the victim. Accordingly, he is not entitled to relief on this issue.

**II. Confrontation Clause.** Next, the Defendant argues that the trial court abused its discretion in admitting the 911 calls into evidence. He asserts that the recordings constitute "testimonial evidence and should have been excluded" and that they violated his constitutional

right to confront the witnesses against him. The State responds that the 911 calls were nontestimonial and were properly admitted as excited utterances. Upon review, we agree with the State.

Prior to trial, the Defendant filed a motion in limine to exclude the 911 calls. The Defendant argued that the recordings were inadmissible hearsay and that the callers did "not appear to have first hand knowledge of the events." The State, relying on State v. Franklin, 308 S.W.3d 799 (Tenn. 2010), responded that the statements in the recordings were not testimonial because the calls were made during an ongoing emergency. The State asserted that the callers did not call the police in preparation for litigation, but rather, "to save [the victim's] life."

The trial court subsequently reviewed the recordings in camera and overruled the Defendant's motion in limine, concluding that the 911 calls were nontestimonial and that "the overriding purpose was private citizens trying to get[] help for another private citizen[.]" In its evaluation of whether the statements were testimonial, the trial court noted the following factors: the declarants were observers and not the victim; the contact was initiated by the declarants, rather than law enforcement; the declarants' responses to the dispatcher's questioning were meant to help the police locate the victim and the vehicle; the 911 calls were recorded as a matter of procedure rather than in preparation for trial; and "[t]he purpose was, in fact, to report something to get some help to somebody who they believed had been abducted and [to] help find[] this victim." The trial court concluded that "[g]enerally speaking, that declarant wouldn't be thinking about calling to report something to be used in a later trial." The court found that the first three calls were made in a state of excitement and constituted excited utterances. It observed that the fourth caller did not "sound that excited, but you can tell from the context that the police were still being dispatched and [had] not yet arrived." Accordingly, the trial court admitted the 911 calls as nontestimonial statements within a hearsay exception.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." Franklin, 308 S.W.3d at 809 (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)). "Whether the admission of hearsay statements violated a defendant's confrontation rights is . . . a pure question of law" that is subject to de novo review. Franklin, 308 S.W.3d at 809 (citing Lilly v. Virginia, 527 U.S. 116, 125 (1999); Lewis, 235 S.W.3d at 142).

The Sixth Amendment to the United States Constitution guarantees all criminal defendants "the right . . . to be confronted with the witnesses against him[.]"  U.S. Const. amend VI; see also Franklin, 308 S.W.3d at 809 ("The right of confrontation is fundamental and applies to the states through the Fourteenth Amendment.") (citing Pointer v. Texas, 380 U.S. 400, 403 (1965); State v. Cannon, 254 S.W.3d 287, 301 (Tenn. 2008)).  Similarly, article I, section 9 of the Tennessee Constitution provides that "the accused hath the right . . . to meet the witnesses face to face[.]"  Tenn. Const. art. I, § 9.  Although the federal and state provisions differ in phrasing, the Tennessee Supreme Court "'has largely adopted the standards used by the United States Supreme Court . . . in determining whether the Tennessee constitutional right has been violated.'"  Lewis, 235 S.W.3d at 144 (quoting State v. Maclin, 183 S.W.3d 335, 343 (Tenn. 2006)) (alteration in original).

In Crawford v. Washington, 541 U.S. 36 (2004), the United States Supreme Court held that out-of-court testimonial statements are inadmissible unless a declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant.  See id. at 68-69; see also Maclin, 183 S.W.3d at 351, abrogated on other grounds by Cannon, 254 S.W.3d 287.  Under Crawford, the threshold question is whether the challenged statement is testimonial or nontestimonial.  See Cannon, 254 S.W.3d at 301 (citing United States v. Hinton, 423 F.3d 355, 358 (3d Cir. 2005)).  The Court declined to comprehensively define "testimonial" and noted that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . as would an approach that exempted such statements from Confrontation Clause scrutiny altogether."  Crawford, 541 U.S. at 68.

In State v. Maclin, the Tennessee Supreme Court adopted a case-by-case approach for reviewing courts to determine whether proffered hearsay was "testimonial" and made "'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'"  Maclin, 183 S.W.3d at 349 (quoting Crawford, 541 U.S. at 52).  The court provided the following list of non-exhaustive factors to guide the analysis of whether a statement is "testimonial":

> (1) whether the declarant was a victim or an observer; (2) whether contact was initiated by the declarant or by law-enforcement officials; (3) the degree of formality attending the circumstances in which the statement was made; (4) whether the statement was given in response to questioning, whether the questioning was structured, and the scope of such questioning; (5) whether the statement was recorded (either in writing or by electronic means); (6) the declarant's purpose in making the statements; (7) the officer's purpose in speaking with the declarant; and (8) whether an objective declarant under the circumstances would believe that the statements would be used at a trial.

Id. See also Franklin, 308 S.W.3d at 818 (reiterating the relevance of the multi-factor test first articulated in Maclin).

In Davis v. Washington, 547 U.S. 813 (2006), the United States Supreme Court refined its holding in Crawford and adopted a "primary purpose" test requiring courts to examine the context in which a statement is given, thereby abrogating State v. Maclin. See Cannon, 254 S.W.3d at 301-02. The Davis Court held that:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis, 547 U.S. at 822. In Davis, the victim called 911 to report that her former boyfriend was assaulting her in her home. In response to a series of questions from the 911 operator, the victim described the nature of the complaint and identified her assailant.[5] Id. at 817-18. After the victim described the context of the assault and the assailant's location, the operator advised that the police would soon arrive. The victim did not appear at Davis's trial, and the trial court admitted the 911 recording over defense objection. Id. at 819. In concluding that the victim's statements to the operator were not testimonial, the Supreme Court noted that her 911 call "was plainly a call for help against bona fide physical threat." Id. at 827. The Court found it compelling that the victim was describing events "as they were actually happening" and that her statements "were necessary to be able to resolve the present emergency[.]" Id. at 827 (emphasis in original); cf. Cannon, 254 S.W.3d at 304 (victim's statements to officer who responded to her 911 call were neither a cry for help nor to provide information to enable officers to address a threatening situation, and were therefore "testimonial" in violation of the defendant's right to confrontation). The Davis Court further recognized that what begins as a nontestimonial police interrogation may evolve into testimonial statements after the exigency of the situation has passed; in this case, after Davis had driven away from the victim's home. Id. at 828-29. To that end, the Davis Court advised trial courts to recognize the point at which responses to interrogation become testimonial and to use in limine procedure to redact or exclude those portions. Id. at 829; see also Cannon, 254 S.W.3d at 305

---

[5] The Davis Court considered 911 operators to be agents of the police for purposes of the Confrontation Clause. See Davis, 547 U.S. at 823 n.2.

(holding that courts should use in limine procedures to balance an accused's right to confrontation against the State's right to present admissible evidence).

The Tennessee Supreme Court in State v. Cannon, 254 S.W.3d 287, adopted the "primary purpose" test and articulated the following procedure for Confrontation Clause analysis:

> A court must first determine whether the statement is testimonial or nontestimonial. Statements are testimonial if the primary purpose of the statement is to establish or to prove past events potentially relevant to later criminal prosecutions. A testimonial statement is inadmissible unless the State can establish that: (1) the declarant is unavailable and (2) the accused had a prior opportunity to cross-examine the declarant. If the statement is nontestimonial, the Confrontation Clause does not apply, and the statement must be analyzed under the traditional limitations upon hearsay evidence.

Id. at 302-03 (citations and internal quotation marks omitted); see also Franklin, 308 S.W.3d at 817 (noting that "[a]n objective standard, focusing on the perspective of a reasonable person, governs the determination of the statement's primary purpose" and that courts should consider the intent of both the declarant and the questioner).

Based on our review, we conclude that the trial court properly found the 911 recordings to be nontestimonial. As in Davis, this case involves statements made to a 911 operator "under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Davis, 547 U.S. at 822; see also Maclin, 183 S.W.3d at 347, n.10 (citing cases in which 911 calls were held to be nontestimonial because: "they were (1) initiated by the victim, (2) made for the purpose of seeking police protection or intervention, (3) made informally, or (4) made for the purpose of stopping crime" and citing cases in which 911 calls were considered testimonial because they were made for the purpose of initiating prosecution or where the declarant "would reasonably believe that the statements would be available for use at a later trial"), abrogated on other grounds by Cannon, 254 S.W.3d 287. Here, the callers had observed the Defendant assault the victim and then forcibly remove her and drive away in a truck. The callers, acting with haste, dialed 911 to report a possible abduction and described the events as they were happening and before the danger had been neutralized. The 911 dispatcher elicited information to enable law enforcement to locate the assailant and to ensure the victim's safety. The callers were responding to the victim's "call for help against bona fide physical threat[,]" Davis, 547 U.S. at 827, and they called 911 with "'no indication that their primary purpose was to do anything but to aid [the victim].'" Franklin, 308 S.W.3d at 821 (quoting State v. Slater, 285 Conn. 162, 178 (Conn. 2008)). Moreover, the declarants provided "frantic

-12-

answers . . . in an environment that was not tranquil, or even . . . safe" and that lacked any indicia of formality. Davis, 547 U.S. at 828. The fact that the 911 recordings were used in a later prosecution did not make them "testimonial." See Franklin, 308 S.W.3d at 819 (citing United States v. Mendez, 514 F.3d 1035, 1046 (10th Cir. 2008)). Although the Defendant argues on appeal that "all of the 911 calls were made after the alleged abduction occured[,]" we note that kidnapping is a continuing crime. State v. Legg, 9 S.W.3d 111, 117 (Tenn. 1999) ("[A]n act of removal or confinement does not end merely upon the initial restraint, and a defendant continues to commit the crime [of kidnapping] at every moment the victim's liberty is taken."). Accordingly, we conclude that pursuant to Franklin and Davis, the trial court's analysis was sound.[6] Having determined that the 911 recordings were nontestimonial and did not invoke the Defendant's right to confrontation, we now consider the recordings under the applicable hearsay law in Tennessee. See Franklin, 308 S.W.3d at 810 (Tennessee Rules of Evidence govern the admissibility of nontestimonial hearsay statements) (citing Lewis, 235 S.W.3d at 145); see also Cannon, 254 S.W.3d at 303.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Rule 802 states that "hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. "'The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court.'" State v. Thomas, 158 S.W.3d 361, 400 (Tenn. 2005) (quoting State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001)). Accordingly, we will not reverse the trial court's ruling on this issue absent a clear showing of an abuse of discretion. Id.

Here, the trial court admitted the 911 recordings under the excited utterance exception to the hearsay rule. Pursuant to Rule of Evidence 803(2), the hearsay rule does not exclude "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). "Underlying the excited utterance exception is the theory that 'circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication.'" Franklin, 308 S.W.3d at 823 (quoting State v. Land, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000)). Three requirements must be met for a statement to qualify as an excited utterance:

_____

[6] We caution that our conclusion in the instant case is not meant to indicate that all 911 emergency recordings are nontestimonial, or even admissible. As previously mentioned, trial courts should be careful to use in limine procedures to balance the accused's right to confrontation against the State's right to present evidence. Moreover, evidence must be relevant to be admitted. See Tenn. R. Evid. 402.

The first requirement is a startling event or condition that suspend[s] the normal, reflective thought processes of the declarant. Second, the statement must relate to the startling event or condition. This broad requirement offers considerable leeway such that the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition. The third and final requirement dictates that the declarant make the statement while under the stress or excitement from the event or condition. This requirement considers a variety of factors, including the interval of time between the startling event and the statement.

Id. (citations and internal quotation marks omitted). The excited utterance exception also has a competency requirement where "the declarant must have had an opportunity to observe the facts contained in the extrajudicial statement." Land, 34 S.W.3d at 529. The "'ultimate test'" of whether a statement is admissible within the excited utterance exception is "'spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication.'" Franklin, 308 S.W.3d at 823 (quoting State v. Smith, 857 S.W.2d 1, 9 (Tenn. 1993)).

In the instant case, we conclude that the 911 calls fulfill the requirements of the excited utterance exception. The declarants each spontaneously reported observing an assault and possible abduction of the victim from Cassell Ridge Apartments, and described the startling event as it was occurring, while still under the stress of the event. The two female callers sounded audibly excited and the male caller was out of breath after having pursued the Defendant's truck on foot. The first caller stated, "Somebody needs to hurry before [the victim] ends up killed." The second caller reported, "Somebody just kidnapped a girl right out of the freaking parking lot." The male caller told the 911 dispatcher, "They tried to run me over, I was trying to stop to get the girl out." The statements in the 911 calls were directly related to the startling event and their purpose was to seek police assistance for the victim. The calls were placed between 1:15 and 1:18 a.m., shortly after the abduction from the apartment parking lot, and the police subsequently arrived at 1:32 a.m. The short interval and the strain of the event belie the opportunity for the declarants to reflect and fabricate their statements. Moreover, the startling event did not end with the abduction. As previously noted, kidnapping is a continuing crime "at every moment the victim's liberty is taken." Legg, 9 S.W.3d at 117. Under these circumstances, the trial court properly admitted the 911 recordings as excited utterances.

Even if the trial court erred in admitting the 911 calls, any error was harmless because Ms. Clark and Mr. Collins testified about the events that the callers described. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate

shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Both eyewitnesses testified that the victim was beaten and held in the truck against her will; that the victim repeatedly attempted to escape but that the Defendant prevented her from leaving; and that the victim suffered bodily injuries as a result. In light of the overwhelming proof in the record, the Defendant cannot show that any erroneous admission of hearsay "more probably than not affected the outcome of the trial." See State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008) (when assessing the impact of a non-constitutional error, the reviewing court may appropriately consider the properly admitted evidence of a defendant's guilt). Accordingly, the Defendant is not entitled to relief on this issue.

## CONCLUSION

Upon review, we conclude that the evidence was sufficient to support the Defendant's conviction for aggravated kidnapping and that the trial court properly admitted 911 recordings as nontestimonial statements within a hearsay exception. However, even if the admission was in error, any error was harmless. The judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE